735 P.2d 1073

## FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF TWIN FALLS, Plaintiff-Respondent,

v.

## EAST END MUTUAL ELECTRIC COMPANY, LTD., Defendant-Appellant.

### No. 16509.

Court of Appeals of Idaho.

April 1, 1987.

Larry Robert Duff and Alan C. Goodman (argued) (Goodman & Duff), Rupert, for defendant-appellant.

John R. Coleman and Thomas M. Robertson (argued) (Coleman, McIntyre & Ritchie), Twin Falls, for plaintiff-respondent.

BURNETT, Judge.

We are asked to decide whether the bylaws of a private electrical cooperative may require, as a condition of transferring membership from one person to another, the payment of any delinquency in the outgoing member's account. This question is presented on appeal from a declaratory judgment in which the district court held that a purchaser of property owned by a member of the cooperative was entitled to membership, and to resumption of electrical service which had been terminated for nonpayment, without bringing the account current as provided in the bylaws. For reasons explained below, we reverse the judgment.

The parties have stipulated to the essential facts. East End Mutual Electric Company, Ltd., is a non-profit cooperative association organized more than sixty years ago for the purpose of delivering electrical energy to its members. In 1976 Glenn Walker became a member of the cooperative and began receiving electrical service to his property. In 1980, Walker obtained

a loan from First Federal Savings and Loan Association of Twin Falls. The loan was secured by a deed of trust on the same property. Walker subsequently experienced financial difficulties and became delinquent on his electrical account. The cooperative terminated service in 1985. Walker also became delinquent on the First Federal loan during that year. First Federal commenced nonjudicial foreclosure proceedings by declaring a default and causing notice to be given of a trustee's sale. Shortly before the sale, the cooperative recorded a claim of lien for unpaid power charges of $1,098.00. First Federal later bought the property from the trustee for the outstanding obligation secured by its deed of trust.

The next day, First Federal asked the cooperative to resume electrical service. The cooperative declined, explaining that its service was limited to members but that First Federal could succeed to Walker's membership if it complied with all requirements of the bylaws, including payment of the arrearage on Walker's membership account. First Federal sued for a declaratory judgment entitling it to membership without paying the arrearage. The district court concluded that the cooperative's bylaws were reasonable with respect to transfers of membership. However, the court went on to hold that First Federal was entitled to a "new" membership without regard to the Walker delinquency. The cooperative brought this appeal.

■ Our analysis begins by noting the essential characteristics of a cooperative. It is "an association which furnishes an economic service without entrepreneur profit and which is owned and controlled on a substantially equal basis by those for whom the association is rendering service."

I. PACKEL, LAW OF COOPERATIVES 2 (3d ed. 1956) (hereinafter PACKEL). The cooperative may or may not be incorporated. In this case it appears that the cooperative has chosen to incorporate under title 30, chapter 3, of the Idaho Code, relating to nonprofit corporations.[1] Persons who hold interests in the incorporated cooperative are known as its "members." I.C. § 30–308. The governance of the cooperative, and the rights of its members, ordinarily are set forth in bylaws adopted by the board of directors. I.C. § 30–309. The bylaws are binding as a contract among the members. The bylaws may prescribe qualifications for future members. *See* PACKEL at 106, 116; I.C. § 30–304.[2]

Here, the cooperative's bylaws address the subjects of membership, transfer of membership and termination of electrical service. Article XI sets forth membership and membership transfer requirements. The pertinent provisions state:

2. Membership in this association shall be evidenced by a membership certificate which shall be in such form and shall contain such provisions as shall be determined by the board of directors....

3. *Any person, firm, association, corporation, body politic or subdivision thereof may become a member of the East End Mutual Electric Company, Limited by* (a) making written application for membership therein [sic] such form as as [sic] may be prescribed by the directors; (b) agreeing to purchase electric energy from the association and to use or permit to be used such electric energy only upon the premises embraced by the application; (c) *agreeing to comply with and be bound by the articles of incorporation and by-laws of the association,* and any rules or regulations adopted by the board of directors; (d)

1. The cooperative originally was incorporated under predecessor statutes dealing with nonprofit corporations. *See* former I.C. §§ 30–1001 et seq.

2. Former I.C. § 30–1005 explicitly recited that the bylaws of a nonprofit corporation could provide for "[t]he number and qualification of members and the terms and conditions of membership." Current I.C. § 30–304 provides that the new statutory scheme "shall not be held ...

to derogate from rights [of corporations created] under prior laws." Thus, although section 30–309 does not explicitly state that a nonprofit corporation may establish qualifications for admission to membership, we believe the statute perpetuates this right as recognized in former I.C. § 30–1005. In any event, the right would appear to be inherent in the nature of the organization.

paying the membership fee; and (e) having his or its application accepted by the board of directors.

4. *Each membership certificate shall be appurtenant to the tract of land for which the same is purchased;* ... No membership certificate shall be transferable separate and apart from the land to which it is appurtenant....

5. *No membership certificate shall be transferred until all indebtedness of every character, including unpaid amounts for electrical energy or service furnished to the premises to which the certificate is appurtenant, shall have been paid in full. All such indebtedness shall constitute a lien on the property to which the membership is appurtenant until fully paid.* [Emphasis added.]

Article XII provides for termination of electrical service to members who fail to pay their bills.

3. The board of directors shall have the power to fix rates for electric energy, charges for other services, dates when bills become due and payable and charges for connecting, disconnecting and reconnecting service lines.

4. *In the event a bill for electric service or any other item is not paid within the period of thirty (30) days from the date upon which the bill becomes due and payable,* as fixed by the board of directors, *the service line to the premises to which the service or other item was furnished shall be disconnected and shall not be reconnected until the delinquent bills together with the charges for disconnecting and reconnecting shall have been fully paid.* Any officer, agent or employee of the association shall have the right to enter upon any premises for the purposes above mentioned. [Emphasis added.]

■ Taken together, these bylaws enable the cooperative to "freeze" open account balances by terminating service and to collect the frozen balances by (a) imposing a lien on the property served or (b) imposing a charge against the membership certificate, which must be paid when the membership is transferred to another person. The first of these collection devices, the real property lien, is of no avail to the cooperative in this case. First Federal's deed of trust was recorded eight years before the cooperative recorded its notice of lien. Accordingly, First Federal's lien was superior. The cooperative evidently decided not to protect its position by attempting to purchase the property at the trustee's sale. As noted previously, First Federal was the purchaser, bidding only the amount owed to it. Thus, no balance remained against which the cooperative could assert its claim. The cooperative's lien upon the property was extinguished. I.C. § 45-1506(2)(d).

■ Our focus, then, is narrowed to the charge against the membership interest. In this regard, it is important to remember that a cooperative is an association of individual members who hold personal ownership interests in the cooperative's enterprise. PACKEL at 114-15. Here, because the enterprise consists of furnishing electrical service to property owned by each member, the membership certificate is described in the bylaws as "appurtenant" to that property. Membership follows title. Consequently, when title changes hands, the new owner may request a transfer of the previous owner's membership—subject, of course, to any conditions imposed elsewhere in the bylaws. Payment of a charge upon the membership, arising from a delinquency in the member's account, is one of those conditions.

■ When a charge upon the membership is asserted against an incoming member, it is tantamount to a charge upon the membership certificate. Such charges may be authorized by statute or, as in this case, by contract embodied in the bylaws. PACKEL at 134-35. They are analogous to liens upon shares of stock in business corporations and are binding upon transferees who have actual or constructive notice of them. *Id. See also* 11 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS §§ 5262-5264 (Rev.1986). In this case First Federal received constructive notice when the cooper-

ative recorded its claim of lien before the trustee's sale. The claim not only asserted a lien upon real property but also contained the following language: "NOTICE IF [sic] FURTHER GIVEN that electrical energy or service will not be furnished by claimant to the above described real property until said sum has been paid in full to claimant."

■ This charge constitutes a restraint upon the right to transfer membership. Indirectly, it also represents a restraint upon the proposed transferee's right to join the cooperative. A cooperative may promulgate appropriate and reasonable rules governing the admission and conduct of members. *See Sutton v. Hunziker,* 75 Idaho 395, 272 P.2d 1012 (1954); *Appeal of Two Crow Ranch, Inc.,* 159 Mont. 16, 494 P.2d 915 (1972); *King v. Farmer's Electric Coop., Inc.,* 56 N.M. 552, 246 P.2d 1041 (1952). Such restraints are enforceable unless they are arbitrary or contrary to public policy. *Capital Electric Power Association v. McGuffee,* 226 Miss. 227, 83 So.2d 837 (1955), *overruled on other grounds, Tideway Oil Programs, Inc. v. Serio,* 431 So.2d 454 (Miss.1983); *Ohio Power Co. v. Village of Attica,* 23 Ohio St.2d 37, 261 N.E.2d 123 (1970); *McCrady v. Western Farmers Electric Cooperative,* 323 P.2d 356 (Okla.1958). The district court in this case found no arbitrariness in the cooperative's bylaws. Rather, the judge declared the bylaws to be "reasonable." We agree. A charge upon the membership certificate is directly related to a legitimate organizational objective—to protect other members from bearing the economic consequences of the outgoing member's default.

Whether the charge contravenes public policy is a more difficult question. Courts in other jurisdictions often have refused, in the absence of a statutory command or a valid lien against the property, to impose upon a new property owner the burden of unpaid "utility" charges incurred by the prior owner. *See generally,* Annot., *Electricity, Gas or Water Charges,* 19 A.L. R.3d 1227 (1968). However, a close analysis of the cases reveals that their discussions of public policy turn largely upon the nature of the service provider. Broadly speaking, there are three types of providers: municipalities, publicly regulated utilities (including publicly regulated cooperatives), and unregulated private cooperatives or corporations.

Municipalities and publicly owned or operated entities long have been required to serve buyers of property within their geographical jurisdictions, regardless of prior defaults by the sellers, unless otherwise provided by statute. *E.g., Farrell v. Ward,* 53 A.2d 46 (D.C.Mun.Ct.App.1947); *Home Owners' Loan Corporation v. Logan City,* 97 Utah 235, 92 P.2d 346 (1939). This broad requirement has been applied in analogous cases to publicly regulated utility companies. Because such companies are imbued with a "public duty" to serve patrons in the area, they generally have no right to require a purchaser to pay the seller's arrearage before resuming service. *United States v. Springwood Village,* 168 F.Supp. 885 (S.D.N.Y.1958); *New Orleans Gas Light and Banking Co. v. Paulding,* 12 Rob. 378 (La.1845); *Turner v. Revere Water Co.,* 171 Mass. 329, 50 N.E. 634 (1898); *Title Guarantee & Trust Co. v. 457 Schenectady Avenue, Inc.,* 260 N.Y. 119, 183 N.E. 198 (1932), *cert. denied,* 289 U.S. 741, 53 S.Ct. 659, 77 L.Ed. 1488 (1933); *Becker v. Brooklyn Edison Co.,* 121 Misc. 96, 200 N.Y.S. 319 (Mun.Ct.N.Y.1923).

As a corollary of this broad requirement, a "no shut-off" rule has been applied to publicly regulated rural electrification cooperatives. *See Yates v. White River Valley Electric Cooperative, Inc.,* 414 S.W.2d 808 (Mo.Ct.App.1967). Some courts have treated electric power cooperatives organized under the federally funded Rural Electrification Administration as public utilities or public service corporations. *E.g., Application of Trico Electric Cooperative, Inc.,* 92 Ariz. 373, 377 P.2d 309 (1962) (public service corporation); *Ohio Power Co. v. Village of Attica, supra* (public utility).

However, the record in this case does not indicate that the East End cooperative is a product of federal funding. More importantly, under Idaho law, nonprofit cooperatives like East End are *not* regulated. *See* I.C. § 61–104. Our Legislature evidently has determined that this type of service provider, which typically serves a limited group of customers and is owned by the

customers themselves, merits a lesser degree of public intrusion upon its freedom of contract. Members of such an incorporated cooperative may, by mutual agreement, adopt regulations governing changes in membership and the suspension or resumption of the cooperative's service. So long as these regulations are not arbitrary and do not infringe upon a fundamental public policy such as nondiscrimination, the regulations are enforceable. We discern no fundamental public policy that is impaired by placing a charge upon a certificate of membership in a cooperative, in order to collect an arrearage in the member's account.

Accordingly, we hold that such a charge may be imposed, pursuant to duly promulgated bylaws of an unregulated, private, nonprofit cooperative, as a condition of transferring an interest in the cooperative to a prospective new member who has notice that the charge must be paid before service will be furnished. We have not been cited, nor have we found, cases contrary to this precise holding. Neither do we find that the district judge reached a different result upon any articulated public policy ground. Rather, he suggested simply that First Federal was entitled to a "new" membership. We disagree. The cooperative's bylaws do not provide for the creation of a "new" membership with respect to property identified to an existing membership. Indeed, by linking each membership to the property served, and by providing for transfers of membership, the bylaws implicitly preclude such "new" membership schemes. First Federal has no right to demand a membership on terms that violate the cooperative's valid bylaws. PACKEL at 123–25. We conclude that the judge erred by suggesting otherwise.

The judgment of the district court is reversed. Costs to appellant. No attorney fees on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.