646 A.2d 398

Charles F. O'DONNELL, M.D. et al.

v.

Carl J. SARDEGNA et al.

No. 138, Sept. Term, 1993.

Court of Appeals of Maryland.

Aug. 25, 1994.

Abraham A. Dash, Bowie (Jon W. Brassel, Brassel & Baldwin, all on brief, Annapolis, Stephen J. Nolan, Nolan, Plumhoff & Williams, Chtd., all on brief), Towson, for appellant.

George Beall (Stephen J. Immelt, James J. Benjamin, Jr., Hogan & Hartson, all on brief, Baltimore), for appellees William A. Beasman, Jr.; Barry Bosworth; J. Owen Cole; Dan A. Colussy; M. Thomas Goedeke, Ed.D.; Frank A. Gunther, Jr.; John D. Jeffries; and Albin O. Kuhn.

Jeffrey B. Maletta * (Kirkpatrick & Lockhart, Washington, DC, Richard C. Burch, Mudd, Harrison & Burch, Towson, John E. Sandbower, III, Phillips P. O'Shaughnessy, Sandbower, Gabler & O'Shaughnessy, P.A., Robert E. Scott, Jr., P.C., Semmes, Bowen & Semmes, all of Baltimore, Chadbourne & Parke of New York City, all on briefs), for appellee.

---

* Specially admitted.

Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

The plaintiffs in this case (Plaintiffs) are subscribers to health services insurance plans offered by a nonstock, non-profit corporation. They sued, on behalf of the corporation, former officers and certain of the corporation's then present directors. Because no Plaintiff is a director or member of the corporation, no Plaintiff has standing to bring this derivative action.

The corporation is Blue Cross and Blue Shield of Maryland, Inc. (BCBSM). It is a Maryland nonstock corporation that resulted from the 1984 consolidation of Blue Cross of Maryland, Inc. and Blue Shield of Maryland, Inc. The articles of consolidation are the original form of the charter of BCBSM. The first of the purposes for which BCBSM was formed, as recited in the charter, is:

"(1) To establish, operate and maintain a non-profit health service plan as authorized by Subtitle 20 of Article 48A of the Annotated Code of Maryland and any and all amendments thereto, whereby hospital, medical, dental and other health care is provided by hospitals, physicians, dentists and other providers to persons who become subscribers to such plan, so that such health care and service may be obtained at a minimum cost and expense."

The charter further provides that "[t]here shall be no capital stock of the Corporation and it shall be operated as a non-profit organization." That basic document identifies by name the initial directors of BCBSM and provides that "[t]he Directors of the Corporation shall also constitute the members of the Corporation and, when meeting as Directors, may exercise the rights and powers of members." Upon the dissolution of BCBSM its remaining assets, per the charter, "shall be used exclusively for the benefit of or distributed to organizations entitled to exemption from federal income taxes under Section 501(c) of the Internal Revenue Code...."

The reference to Subtitle 20 in the purposes section of the BCBSM charter is to the Maryland Insurance Code subtitle on "Nonprofit Health Service Plans," which governs BCBSM. References in this opinion to the Insurance Code will be to Maryland Code (1957, 1991 Repl.Vol.), Art. 48A, unless otherwise indicated. Article 48A, § 355(b)(6), part of Subtitle 20, deals with the reserves of nonprofit health service plans. Under that section the Insurance Commissioner of Maryland (the Commissioner), after determining that reserves are excessive, may order the insurer to submit a plan for distribution of the excess reserves to subscribers covered at the time distribution is made.[1] Nonstock corporations are governed by Md.Code (1975, 1993 Repl.Vol.), §§ 5–201 through 5–208 of the Corporations and Associations Article (CA). But, CA § 5–201 states that

"[t]he provisions of the Maryland General Corporation Law apply to nonstock corporations unless:

(1) The context of the provisions clearly requires otherwise; or

(2) Specific provisions of [the nonstock corporations] subtitle or other subtitles governing specific classes of corporations provide otherwise."

In the instant matter Plaintiffs do not contend that the Insurance Code, the CA Article, or a combination of both, prohibit BCBSM from limiting its membership to its directors, or from utilizing a self-perpetuating method for electing directors.

---

1.  Article 48A, § 355(b)(6) in relevant part reads:
    "If the Commissioner determines after a hearing that the reserves are excessive in amount, he may order the corporation to submit a plan for distribution of the excess in a fair and equitable method, or in the event the corporation fails to submit such a plan within 60 days, he may compile a plan and order the corporation to implement it. The distribution shall be made only to subscribers who are covered by the corporation at the time distribution is made. Reserves equal to 2 months of the nonprofit health service plan's prior calendar year's claims and operating expenses shall be considered reasonable."

The present litigation is the direct result of an investigation of BCBSM by the staff of the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate. The Senate staff report was made public on September 24, 1992, the first day of hearings conducted by the Subcommittee regarding BCBSM. That report concluded that BCBSM suffered from poor management.

From 1985 to 1992 the president and CEO of BCBSM was Carl J. Sardegna (Sardegna) who, in 1986, also became chairman of the board of directors of BCBSM (the Board). At a Board meeting on October 8, 1992, an outside director replaced Sardegna as chairman of the Board. The Board also appointed a special review committee of five directors to review operations and policies. At the Board meeting of December 4, 1992, the chairman produced Sardegna's resignation which the Board unanimously and immediately accepted. Prior to his resignation, Sardegna had terminated as BCBSM officers four persons later named as defendants in the instant action. Fred M. Gloth, Jr. (Gloth), also sued in this action, was a senior vice president and general counsel. He retired in February 1993.

Counsel for the Plaintiffs, by letter of March 4, 1993, made demand on BCBSM to bring action to recover losses caused by alleged mismanagement in certain areas of the corporation's activities. The Attorney General of Maryland on March 23, 1993 wrote to the Chairman of the Board expressing the view that the Board was compelled to make "a thorough and thoughtful examination" of the "misconduct" referred to by Plaintiffs' counsel and in the Senate staff report. At its meeting on March 25, 1993, the Board appointed a special committee to investigate possible claims of gross mismanagement and breach of fiduciary duties, and the Board authorized the employment of special counsel.

The instant action was commenced on March 31, 1993. Among those named as defendants were two of the three members of the special committee of the Board. Consequently, at the Board meeting of April 12, those two directors were

replaced, as committee members, by two directors who were neither BCBSM employees nor members of the Board during the period 1985 through 1992 that was involved in the allegations of the Plaintiffs' complaint. That committee, known as the Special Litigation and Indemnification Committee (SLIC), was authorized to investigate and to decide on behalf of BCBSM whether to pursue claims raised by, or related to, the Plaintiffs' allegations.[2]

The Plaintiffs ultimately stated their claims in a second amended complaint. They describe themselves as subscribers to various health service plans offered by BCBSM.[3] The defendants are Sardegna, Gloth, eight members of the Board as constituted when the second amended complaint was filed, the four former officers whose employment had been terminated, Booz–Allen & Hamilton, Inc., a consulting firm (Booz–Allen), and one of Booz–Allen's officers.

The Plaintiffs allege waste of corporate assets in perquisites, salaries, and bonuses. They allege millions of dollars of losses resulting from the formation and operation of a finance company as a subsidiary of BCBSM. They allege further losses in the millions of dollars from the formation and operation of another subsidiary engaged in a medical credit card business and in making and servicing loans to medical providers. They allege further losses of millions of dollars in connection with the attempted development of a claims processing computer system known as CARE. The Plaintiffs aver that the Booz–Allen defendants, together with BCBSM's former officers, concealed from the Board and from the public a Booz–Allen report concluding that expenditures for CARE were nearly triple the original $9 million estimate, that the

---

2. For a case involving appointment by a corporate board of directors of a special litigation review committee, see *Rosengarten v. Buckley,* 613 F.Supp. 1493 (D.Md.1985).

3. The one exception to this statement is the lead Plaintiff, Dr. Charles F. O'Donnell, who is covered by Medicare which is administered by BCBSM. Because Dr. O'Donnell's interest in BCBSM is even more remote than that of the subscriber Plaintiffs, our discussion of standing on the part of the Plaintiffs refers only to the subscriber Plaintiffs.

costs of operating the system would exceed the cost of the existing system by a factor of two or three, and that the benefits of CARE were impossible to measure. The Plaintiffs recycle their factual allegations relating to the above-described subjects under the labels of various torts and breaches of fiduciary duties. The damages sought in each of the fifteen counts of the second amended complaint are to be paid to BCBSM.

In a section of the second amended complaint that presents general background facts under the heading, "Maintainability of the Action on Behalf of BCBSM," paragraphs 26 and 27 allege the following:

"26. The Plaintiffs are seeking an accounting and damages from members of the Board of Directors and Officers of BCBSM for corporate waste, breach of fiduciary duty, breach of implied contract, unfair trade practices, and gross negligence and gross mismanagement. Plaintiffs contend that because a majority of BCBSM's present Board members themselves have participated in many acts of waste and gross negligence and mismanagement, a demand upon the Board, itself, to commence this action would be futile."

"27. It is further alleged that contrary to the corporate mission set forth in the BCBSM Charter to provide health care and service at a minimum cost and expense, the Defendant Directors and Officers grossly misdirected corporate assets and resources causing substantial damages to this public trust company and its subscribers."

Pursuing the same theme, paragraph 28 alleges that the purpose of the charter in a nonstock, nonprofit corporation such as BCBSM is to protect the interests of the subscribers from the persons who control the corporation, so that there is an implied contract under which the directors and officers are "to conform to and fulfill the charter mission...."

The defendants moved to dismiss asserting, *inter alia,* a lack of standing. The circuit court stayed the action until the

SLIC reported. That report was completed on October 28, 1993.

The SLIC concluded:

1. Booz–Allen made misrepresentations to the Board relating to CARE, and BCBSM would institute suit against Booz–Allen.[4]

2. BCBSM would sue Gloth to recover an allegedly unauthorized bonus.

3. Although Sardegna and Gloth "made serious errors of judgment and demonstrated a profound lack of diligence and candor in their relations with the Board," that conduct did "not warrant a direct action for monetary recovery." The conduct, however, furnished "independent grounds for the Board's previous decision to deny [their] claims for payment of more than $5 million under their supplemental executive retirement plans."

4. The Plaintiffs' other claims "have no merit under applicable legal standards."

The fourth conclusion resulted from applying two levels of evaluation. The SLIC first considered whether the conduct of BCBSM's officers and directors in the challenged activities was actionable. In any instance in which the conduct arguably might be considered actionable, the SLIC concluded that the conduct did not amount to "active and deliberate dishonesty ... material to the cause of action," as required under a limited liability provision added to BCBSM's charter in April 1988.[5]

Pursuant to the SLIC determination, BCBSM intervened in the instant action as a defendant. It moved for summary judgment, filing as exhibits the SLIC report and all of its

---

4. That suit was filed in a Maryland circuit court and removed to federal court. Booz–Allen has counterclaimed, alleging that BCBSM withheld information from Booz–Allen. The suit was pending at the time of oral argument.

5. The validity of the limited liability provision is challenged by the Plaintiffs, but we do not reach that issue.

underlying documentation. BCBSM joined with the other defendants in advancing lack of standing as a ground for dismissal.

The circuit court concluded that the Plaintiffs had no standing and entered judgment in favor of the defendants. The Plaintiffs appealed, and this Court on its own motion issued the writ of certiorari before consideration of the matter by the Court of Special Appeals.

## I

From Plaintiffs' brief-in-chief we distill two theories for their standing. First, they argue that they should be allowed to bring a derivative action. They assert that there are similarities between their "equitable interest" in BCBSM's corporate assets and the interest of stockholders in a stock company's assets, Appellants Brief at 17, and that there is a trend in case law "to expand the concept of standing to achieve equitable results." *Id.* at 20. Second, they argue that they have standing as private attorneys general, because BCBSM is a "quasi-public agency which serves a public function, ... its financial stability impacts every citizen of Maryland," and because they are plaintiffs of last resort. *Id.* at 26.

In their reply brief, however, Plaintiffs state that the "derivative form itself is not asserted as a basis for standing." Rather, they have "sought the use of the derivative action to achieve equitable results." Reply Brief at 9–10. Their asserted standing is

"premised upon three legal and equitable concepts: (1) the right of individuals to seek redress for a public wrong when those individuals have demonstrated some kind of special damage ...; (2) the right of individuals to seek redress for damages based upon statutory and fiduciary duties ...; and (3) the right of individuals to act as Private Attorneys General when such individuals become the only remaining party of interest who can or are willing to assert their rights and protect the public interest."

*Id.* at 1 (citations omitted). We interpret the Plaintiffs' arguments to include a request for expansion of the law of standing if their claims are not embraced by the existing law.

The defendants argue that members of a nonstock corporation are the legal equivalent of stockholders in a stock corporation, and that no one whose interest is more remote than that of a member should be granted standing to sue derivatively on behalf of a nonstock corporation. The defendants view the Plaintiffs essentially as customers, because (1) they have no equity interest in BCBSM's long term success, and (2) lacking any voting power, they have no say in corporate governance. Rather, Plaintiffs have disparate, personal goals that may conflict with those of BCBSM.

## II

Under conventional legal analysis the claims alleged in the second amended complaint may be maintained by the Plaintiffs only if they have standing to maintain a derivative action. The alleged wrongs described in the complaint clearly are suffered directly by BCBSM and only indirectly by its subscribers.

Attempting to demonstrate that they have a special interest in BCBSM's assets, Plaintiffs point to Art. 48A, § 355(b)(6) under which there might be a distribution to BCBSM's subscribers if certain conditions are met, including a determination by the Commissioner that the insurer's reserves are excessive. That is not the state of facts for the years involved in the complaint. In any event, shareholders in a stock corporation may not sue in their own right to recover damages for an injury to the corporation. "[A]lthough [the injury] may diminish the value of the capital stock, [it] is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation." *Waller v. Waller*, 187 Md. 185, 189, 49 A.2d 449, 452 (1946). *See also Tafflin v. Levitt*, 92 Md.App. 375, 381, 608 A.2d 817, 820, *cert. denied*, 328 Md. 447, 614 A.2d 974 (1992) (depositors of defunct savings and loan did not have

standing to sue directly and individually to recover from former officers and directors, where they alleged no special damage not common to other depositors). The relationship of BCBSM to Plaintiffs is even more remote than that of a stock corporation to its shareholders or of a defunct savings and loan association to its depositors. Consequently, Plaintiffs may not sue on their own behalf. The issue here is whether Plaintiffs may sue derivatively.

### III

In approaching resolution of the issue we have considered whether Plaintiffs might be classified as members of a consumer cooperative, or as insureds in a mutual insurance company. We conclude that they are neither.

### A

At oral argument, Plaintiffs placed some emphasis on an analogy between BCBSM and a cooperative. In *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 242 A.2d 512 (1968) (*Parish I* ), we held that members of the Maryland and Virginia Milk Producers Association could bring a derivative action against the association's former directors, its auditor, and two former employees. The association was organized as a "farm cooperative" under former Md.Code (1957), Art. 23, §§ 349 through 377, the predecessor provisions to current CA §§ 5–501 through 5–532. The members of the association each had one vote on all issues voted upon at membership meetings. 250 Md. at 91, 242 A.2d at 549. The opinion in *Parish I* did not expressly address why a member of a cooperative has standing to sue derivatively.

*Parish v. Maryland & Virginia Milk Producers Ass'n,* 261 Md. 618, 277 A.2d 19, *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971) (*Parish II* ), discussed whether the chancellor had applied the correct standard of care after the remand in *Parish I.* In that connection this Court stated, "In dealing with the question whether the appellants lacked standing to maintain this action the chancellor thought there was a

'fiduciary relationship subsisting between the members and the Association as a result of the consignment to the Association of their produce.'" 261 Md. at 680, 277 A.2d at 48.

Currently, there are four subtitles in the "Special Types of Corporations" title of the CA Article that provide for cooperatives: Subtitle 5, entitled "Agricultural Cooperatives," §§ 5–501 through 5–532; Subtitle 5A, "Maryland Consumer Cooperative Act," §§ 5–5A–01 through 5–5A–30; Subtitle 6, "Electric and Transportation Cooperatives," §§ 5–601 through 5–602, and Subtitle 6B, "Maryland Cooperative Housing Corporation Act," §§ 5–6B–01 through 5–6B–20. This Court has previously noted, in tracing the history of Art. 48A, Subtitle 20, that "health service plans were originally like a consumer cooperative which arranged prepaid health care for its members with hospitals or physicians...." *Insurance Comm'r v. Blue Shield of Maryland, Inc.*, 295 Md. 496, 505, 456 A.2d 914, 919 (1983).

Under the Maryland Consumer Cooperative Act a consumer cooperative is a corporation, converted or organized under CA Title 5, Subtitle 5A, "which operates or intends to operate on a cooperative basis for the mutual benefit of its members, subscribers, and patrons and conforms to this subtitle." CA § 5–5A–02(b)(1). In that statute "subscriber" means one who is "eligible for membership and legally obligated to purchase a share or shares of, or membership in, the cooperative in accordance with its bylaws." § 5–5A–02(k). In a § 5–5A–02(b) consumer cooperative, each member must have one vote. *See* § 5–5A–02(c)(1) and § 5–5A–20(a) and (b).[6] The Plaintiffs in the case before us are not members of BCBSM, have no right to vote, and have no control over the corporation, even if it is operated for the benefit of the subscribers.

A leading writer on cooperatives considers substantially equal control by the members as an element in a general definition of a cooperative. *See* I. Packel, *The Organization*

---

6. An exception in the cited sections for a federated cooperative is not relevant to the instant matter.

*and Operation of Cooperatives* 2 (1970). In *First Fed. Sav. & Loan v. East End Mut. Elec. Co., Ltd.*, 112 Idaho 762, 735 P.2d 1073 (Idaho Ct.App.1987), the court adopted Packel's definition (a cooperative "is 'an association which furnishes an economic service without entrepreneur profit and which is owned and controlled on a substantially equal basis by those for whom the association is rendering service.' "). *Id.* at 764, 735 P.2d at 1075.

The court in *Ozark Border Elec. Coop. v. Stacy*, 348 S.W.2d 586, 587 (Mo.Ct.App.1961), emphasized the following features of a cooperative:

> "As enumerated in *Greene County Rural Electric Co-operative v. Nelson*, 234 Iowa 362, 12 N.W.2d 886, 888(2), ' "(t)he basic legal and economic principles of the cooperative scheme are limitation upon the voting power and restrictions upon alienation of voting stock or membership interests, *thus preserving the dispersion of control and keeping the control within the class affected; limiting the use of proxies, thus fixing the responsibility upon the co-operators;* the limitation of earnings upon invested capital, thus insuring the non-profit character of the scheme; and the distribution of earnings or savings upon a patronage basis, that is, according to the quantity or value of products marketed through the association by the respective members." ' "

(Emphasis added).

Another court has said that "[b]roadly speaking, a cooperative is a corporation organized for the purpose of rendering economic services, without gain to itself, to shareholders or members who own and control it." *United Grocers, Ltd. v. United States*, 186 F.Supp. 724, 733 (N.D.Cal.1960), *aff'd*, 308 F.2d 634 (9th Cir.1962). This is also the first definition that appears in *Black's Law Dictionary* (5th ed. 1979).

Thus in the matter at hand, the attempted analogy between BCBSM subscribers and the members of a cooperative fails.

B

■ We have also considered, *sua sponte*, whether BCBSM could be classified as a mutual insurer. There is authority recognizing the standing of a policyholder in a mutual insurance company to sue derivatively the company's officers and directors. *See Rowen v. LeMars Mutual Ins. Co. of Iowa*, 230 N.W.2d 905 (Iowa 1975); *Pathfinder Life Ins. Co. v. Livingston*, 140 Neb. 354, 299 N.W. 537 (1941); *Amabile v. Lerner*, 64 N.J.Super. 507, 166 A.2d 603 (N.J.Super.Ct.Ch.Div.1960), *aff'd*, 74 N.J.Super. 443, 181 A.2d 520 (1962). *Cf. Clifford v. Metropolitan Life Ins. Co.*, 264 A.D. 168, 34 N.Y.S.2d 693 (1942) (standing assumed).

Mutual insurers in Maryland are governed mainly by Art. 48A, Subtitle 17, "Stock and Mutual Insurers," and by CA Subtitle 5, "Insurance Companies," of Title 6, "Regulated Finance and Insurance Corporations," §§ 6–501 through 6–513.

Article 48A, § 248 defines a "mutual insurer" as "an incorporated insurer without capital stock . . . the governing body of which is elected as provided in this article." Section 250 provides that every domestic insurer is "subject to the provisions of" CA Title 6, Subtitle 5.

CA § 6–501 defines "mutual insurer" as "an incorporated insurer without capital stock, the governing body of which is elected as provided in this subtitle." Each policyholder of a domestic mutual is a "member." § 6–506(a). Each member is entitled to one vote, unless the bylaws provide for a different number of votes based on the insurance in force, the number of policies held, or the amount of premium paid. § 6–507(a). "Under any group policy, only the policyholder shall be a member of the mutual insurer entitled to vote at the meetings of the mutual insurer." § 6–507(b).

For at least the reason that the subscribers to BCBSM do not vote to elect the governing body of the nonstock corporation, it is not a mutual insurer under Maryland law.

## IV

Inasmuch as Plaintiffs are neither members of a cooperative nor insureds in a mutual insurance company, their asserted standing seemingly must rest on the status of subscribers to health service plans issued by a nonstock, nonprofit corporation that is regulated under Subtitle 20 of Art. 48A. In this Part IV we consider how decisions applying corporation law bear on that issue.

The issue is brought into excellent focus by Professor Deborah DeMott in *Shareholder Derivative Actions* § 2:04, at 22 (Supp.1993). That commentator states:

"Not-for-profit corporations have been characterized as corporate 'Cinderellas,' as the 'neglected stepchildren of modern organization law,' relegated to the hand-me-downs of their half-siblings, for-profit business organizations. Statutory neglect or inattention is probably the best explanation for the predicament of a member of a not-for-profit corporation who believes its affairs to be mismanaged by its directors. Most states do not permit a member of a not-for-profit to sue derivatively on its behalf. Thus, the member either must persuade the corporation's directors to take action on its behalf—which they are unlikely to do if they are the cause of the mismanagement—or must persuade the state's attorney general, typically the state official charged with protecting the interests of not-for-profit corporations and charitable trusts, to pursue his complaint. If neither of these courses is successful, the member's grievance goes unanswered."

(Footnotes omitted).

According to the same author:

"Cases in a few jurisdictions, in the absence of express statutory authorization, have also permitted members to sue on behalf of not-for-profit corporations. The general rule, however, is that only the attorney general has standing to sue in the event of a breach of fiduciary duty by a not-for-profit or its officers or directors or claims of corporate

mismanagement, just as nonmember beneficiaries lack standing to litigate such claims."
*Id.* at 24 (footnotes omitted).

This Court has recognized a derivative action by a member of a nonstock corporation. *See Parish I* and *Parish II.*[7] Further, CA § 1–403, dealing with the defense of *ultra vires*, recognizes in subsection (c) that "[l]ack of corporate power or capacity may be asserted . . . in a representative suit brought by a stockholder against its present or former officers or directors." Throughout the CA Article " '[s]tockholder' . . . includes a member of a corporation organized without capital stock." CA § 1–101(t). Of course, the hurdle that the Plaintiffs must clear is that they are not members of BCBSM.

Derivative suit standing of nonmembers was involved, but not decided, in *United Wire, Metal & Mach. Health & Welfare Fund v. Board of Sav. & Loan Ass'n Comm'rs,* 316 Md. 236, 558 A.2d 379 (1989). The issue in that case was whether the court that was conducting the receivership of a savings and loan association abused its discretion in authorizing the corporate receiver's release of claims against the officers and directors of the private corporation that had insured accounts in the savings and loan. The release was part of the settlement of an action brought by the receiver, in its capacity as successor by merger to the insurer, against former officers and directors of the insurer. The plaintiff, a depositor in the savings and loan, argued that the receiver should have sued in its capacity as receiver, that is, that the receiver, as a custom-

---

7. Cases from other jurisdictions in which courts have entertained derivative suits by a member of a nonstock, nonprofit corporation include *Beard v. Achenbach Memorial Hosp. Ass'n,* 170 F.2d 859 (10th Cir.1948); *Goodman v. Perpetual Bldg. Ass'n,* 320 F.Supp. 20 (D.D.C. 1970) (unincorporated association); *Wickes v. Belgian Am. Educ. Found., Inc.,* 266 F.Supp. 38 (S.D.N.Y.1967); *Denckla v. Independence Found.,* 41 Del.Ch. 247, 193 A.2d 538 (1963); *Kirtley v. McClelland,* 562 N.E.2d 27 (Ind.Ct.App.1990) (condominium unit owners association); *Valle v. North Jersey Auto. Club,* 141 N.J.Super. 568, 359 A.2d 504 (1976), *aff'd as modified,* 74 N.J. 109, 376 A.2d 1192 (1977); *Hannewald v. Fairfield Communities, Inc.,* 651 S.W.2d 222 (Tenn.Ct.App.1983) (residential community property owners association); and *Bourne v. Williams,* 633 S.W.2d 469 (Tenn.Ct.App.1981) (same).

er of the insurer, should have sued the insurer's officers and directors on behalf of the insurer corporation. *Id.* at 242–44, 558 A.2d at 381–83. We held that the receivership court did not abuse its discretion for a variety of reasons. Among them was that the receiver "would have failed in its responsibilities as a State agency to the taxpaying public" if it had "turned its back on the well recognized legal theory actually asserted and undertaken to sue on the more uncertain theory of the case advocated by" the depositor. *Id.* at 247, 558 A.2d at 384.

A relative handful of cases have arisen in which a nonmember has attempted to bring a derivative action on behalf of a nonprofit corporation. With but one possible exception that our research has disclosed, the cases hold that nonmembers have no standing. *Chambrella v. Rutledge*, 69 Haw. 271, 740 P.2d 1008 (1987), is illustrative. Unity House, a nonprofit corporation, was chartered as a benevolent and fraternal organization of members and friends of the American Federation of Labor (AFL) in Hawaii, and also to provide suitable quarters for meetings, recreation, and education of members of Unity House and their families. The plaintiffs were members of AFL locals in Hawaii. 740 P.2d at 1010. Those locals had contributed substantially to the Unity House project, but the plaintiffs were not formally members of the nonprofit corporation. *Id.* at 1011–12. Their claim on behalf of Unity House against its president for waste and conversion of corporate assets was dismissed by the trial court for lack of standing. *Id.* at 1012. That holding was affirmed. The appellate court, however, gave the plaintiffs an opportunity to attempt to proceed in their own right. *Id.* at 1016–17.

*Leeds v. Harrison*, 7 N.J.Super. 558, 72 A.2d 371 (1950), was a derivative action against the officers and directors of the incorporated branch of the Young Women's Christian Association in Atlantic City. The action was brought both by member and nonmember plaintiffs, alleging that the defendants were operating the corporation in violation of its purposes in a number of respects. 72 A.2d at 373–74. The court held that "the member plaintiffs have a legal right to question in this

court the conduct of the business of the corporation by defendants in the particulars alleged, to ascertain whether there resulted a violation of their contractual rights or the fiduciary relationship." *Id.* at 380. The plaintiffs who were merely contributors to the charitable corporation or who were nonmembers had no standing. Citing New Jersey cases, the court held that "a member of the public has no standing to question the administration of a charitable trust." *Id.* The nonmember plaintiffs, however, were allowed an opportunity to obtain the participation of the Attorney General of New Jersey. *Id.*

In Massachusetts, the assertion of claims of mismanagement against the board of a charitable corporation is considered to be exclusively the province of the attorney general so that even members of the corporation may not sue derivatively. *See Lopez v. Medford Community Center, Inc.,* 384 Mass. 163, 424 N.E.2d 229 (1981). In Pennsylvania, the parent of a player on a team in a youth baseball league, organized as a nonprofit corporation, had no standing to sue that entity. *Keranko v. Washington Youth Baseball, Inc.,* 136 Pa.Commw. 709, 584 A.2d 1082 (1990).[8] A Georgia case involved students enrolled in a private college, incorporated as a charitable corporation. They had no standing to sue the board of trustees for alleged waste in contracting to sell land owned by the college, inasmuch as the students' relation to the college was "essentially contractual in character." *Miller v. Alderhold,* 228 Ga. 65, 184 S.E.2d 172, 174 (1971).[9]

---

**8.** The court in *Keranko* did not reach the merits of whether the league's failure to include the plaintiff's son on the league all-star team gave rise to a cause of action.

**9.** A contrary result, on different reasoning, was reached in *Jones v. Grant,* 344 So.2d 1210 (Ala.1977). There members of the faculty, staff and student body of a college brought a class action against the president and members of the board of directors alleging misuse of funds supplied by the federal government, a church, and students. The court classified the institution as a charitable trust of which the students, staff and faculty were beneficiaries, and the court ruled that the Attorney General of Alabama was not the exclusive potential plaintiff.

*Basich v. Board of Pensions of the Evangelical Lutheran Church in America,* 493 N.W.2d 293 (Minn.Ct.App.1992), arose out of a dispute over investment in companies doing business in South Africa during apartheid. The Evangelical Lutheran Church of America (ELCA), a nonprofit corporation, had established a separate nonprofit corporation, the Board of Pensions of ELCA. Members of ELCA were the persons selected to serve on the Churchwide Assembly, and the Pension Board's articles of incorporation stated that it had no members with voting rights.[10] *Id.* at 294. The investment limitation was challenged, as a breach of duty on the part of the Pension Board, by three ministers who participated in the pension plan. Dismissal of the suit was affirmed. "[B]ecause appellants were not members of the corporations, they lack standing to bring a derivative suit." *Id.* at 296.

A trial court decision in New York permitted nonvoting members of a membership corporation to sue derivatively. *Atwell v. Bide–A–Wee Home Ass'n,* 59 Misc.2d 321, 299 N.Y.S.2d 40 (N.Y.Sup.Ct.1969). The corporation apparently operated an animal shelter, and the individual defendants allegedly were destroying animals not incurably ill. According to the bylaws only "executive" and "life" members could vote in the corporation, but other classes of contributors, although not entitled to vote, were denominated as members. 299 N.Y.S.2d at 42. Some of the plaintiffs qualified for the latter categories, and the court held that that sufficed for standing. *Id.* at 43. In BCBSM, by contrast, the Plaintiffs not only have no vote, they have no membership.

The sole case to which we have been cited that tends to support the Plaintiffs' position is the litigation before Judge Gesell in the United States District Court for the District of

---

*Id.* at 1212. There is no contention in the instant matter that BCBSM is a charitable trust of which the Plaintiffs are charitable beneficiaries.

**10.** Although the opinion is silent on this aspect of the facts, we assume that directors of the Pension Board were either self-perpetuating or were persons elected or selected to fill designated positions in ELCA or in the Churchwide Assembly.

Columbia reported in *Stern v. Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries,* 367 F.Supp. 536 (D.D.C.1973) (*Stern I* ), and in 381 F.Supp. 1003 (D.D.C.1974) (*Stern II* ). Former patients sued the officers and directors of a nonprofit hospital, alleging, *inter alia,* that they had allocated the hospital's financial services business among themselves. In *Stern I* the court permitted the action to proceed on the theory that the plaintiffs " 'have a sufficient special interest to challenge the conduct of the trustees operating this charitable institution on a theory of breach of trust.' " 367 F.Supp. at 540 (quoting earlier ruling by the same court). The court said that the "[p]laintiffs unquestionably may proceed on behalf of all patients to press for appropriate injunctive relief and possibly an award of damages to be paid into the Hospital's funds . . . ." *Id.*

After trial on the merits, the court recognized in *Stern II* that

"the modern trend is to apply corporate rather than trust principles in determining the liability of the directors of charitable corporations, because their functions are virtually indistinguishable from those of their 'pure' corporate counterparts."

381 F.Supp. at 1013. One difference is that

"[a] trustee is uniformly held to a higher standard of care and will be held liable for simple negligence, while a director must often have committed 'gross negligence' or otherwise be guilty of more than mere mistakes of judgment."

*Id.* The defendants in *Stern* had violated the less onerous standard of care by totally abdicating their responsibilities as directors and by permitting two hospital administrators to operate the facility unchecked. No monetary relief was granted, however, although certain disclosure procedures were ordered to be followed. *Id.* at 1018–21.

The principal significance of *Stern* for present purposes is that, after the court shifted its duty analysis from the trust model to the corporation model, it never reconsidered whether the patients had standing to sue.

The meaning of *Stern* became involved in aspects of *Christiansen v. National Sav. & Trust Co.*, 683 F.2d 520 (D.C.Cir. 1982). The plaintiffs, federal employees, subscribed to health insurance plans available to them, pursuant to a contract with the federal government, through, *inter alia,* Group Hospitalization, Inc., a nonprofit corporation which was the Washington, D.C. representative of the Blue Cross Association. The plaintiffs complained that their premiums were not properly invested. *Id.* at 521. Directors of Group Hospitalization were joined with it and others as defendants, but the theory of the claim was that a trust relationship existed directly between plaintiffs and defendants and not that the plaintiffs sued in the right of Group Hospitalization. *Id.* at 528. The trial judge in *Christiansen* "had considerable difficulty" with *Stern* on issues of duty and standing, and that judge treated "the *Stern* decision as constituting 'novel precedent' and as representing the 'outer limits of the imposition of liability on directors of non-profit corporations on trust theory grounds.' " *Id.* at 527. The district court in *Christiansen* concluded that *Stern* "considered that someone ought to be able to enforce the [directors'] duties in litigation, and if the patients could not, there was no one else." *Id.* at 528. The appellate court in *Christiansen* was not required to express its view on that analysis because the *Christiansen* plaintiffs were not seeking to enforce fiduciary duties owed by the directors of Group Hospitalization to that corporation. *Id.* at 529. On the merits the court held that the various contractual relationships under the federal government's health insurance program did not create an express trust or fiduciary duties running directly from the defendants to the plaintiffs.

The *Stern* argument resurfaced in an action that is the fraternal, if not identical, twin of the action before us, and that recently has been decided by the Superior Court of the District of Columbia. In *Lazarte–Rodriguez v. Gamble,* No. 93–CA3973 (D.C.Sup.Ct. June 8, 1994), the plaintiffs were subscribers under plans of the merged Blue Cross and Blue Shield companies in the District of Columbia, and they sued officers and directors of that insurer on behalf of the corpora-

tion. The action was dismissed for lack of standing. Three points stand out in the trial judge's written opinion:

- "Courts have not recognized a[n] ... 'equitable member' doctrine." *Id.* slip op. at 5.

- "[T]here is no statutory authority to support plaintiffs' proposition that customers of a nonprofit corporation are members and thus may maintain a derivative action." *Id.*

- In *Christiansen* the court "examined both *Stern* opinions and concluded that they provided no reasoned basis for concluding that the [directors] owed a fiduciary duty to the patients." *Id.* slip op. at 7.

In sum, there is no statutory authorization or judicial precedent directly supporting the standing of the Plaintiffs to bring a derivative action on behalf of BCBSM.

## IV

The position advocated by the Plaintiffs is not without support in legal literature on nonprofit corporations. But the issue of whether any, and if so which, nonmembers of which nonstock, nonprofit corporations should be able to sue officers and directors on behalf of the corporation is only part of a much larger and more complex picture. To describe the larger problem we draw on Professor Henry B. Hansmann's extensive article, *Reforming Nonprofit Corporation Law*, 129 U.Pa.L.Rev. 497 (1981) (Hansmann).

"[T]he basic corporate law applicable to nonprofit organizations is at a remarkably immature state of development, and remains startingly uninformed by either principle or policy." Hansmann at 500. Hansmann considers the "defining characteristic of a nonprofit organization" to be the prohibition on the distribution of profits "to individuals who exercise control over it, such as its directors, officers, or members." *Id.* at 501. This he calls the "'nondistribution constraint.'" *Id.* The author attempts generally to classify corporations subject to the nondistribution constraint according to their sources of income and according to the way in which they are controlled.

*Id.* at 502. There are "organizations that receive the bulk of their income from relatively unrestricted donations and contributions," and there are those that "obtain most of their income from prices charged for goods or services they produce." *Id.* Hansmann calls "the individuals who are the ultimate source of" the income of either class "patrons" of the organization. *Id.* There are organizations subject to the nondistribution constraint that are controlled by their patrons, and there are those that are not. *Id.* at 503. These general groupings encompass organizations as varied as art museums, political clubs, country clubs and community hospitals. *Id.*

After reviewing many aspects of nonprofit corporations, Hansmann turns his attention to standing to sue and summarizes as follows:

"Because the nondistribution constraint ... is for the protection of the organization's patrons, it seems natural to provide for patrons to participate in the enforcement of that constraint by giving them a cause of action against anyone who violates it. As it is, however, the nearly universal rule is that patrons generally have no standing to bring such a suit."

*Id.* at 606.

Specifically addressing the member versus nonmember dichotomy, Hansmann submits that

"all patrons of a given nonprofit, just like all shareholders in a business corporation, have a similar interest in seeing that the organization, and hence they, are not defrauded by the organization's management. If anything, members are less in need of standing to sue a nonprofit's management than are nonmember patrons, because members generally have the opportunity of exercising some control over the organization's management through the exercise of voting power."

*Id.* at 613.

By approving *Stern* and *Jones v. Grant,* 344 So.2d 1210 (Ala.1977), it is apparent that Hansmann would achieve "the objective of extending a clear grant of standing to patrons of

nonprofit organizations" by judicial, as well as by legislative, action. Hansmann at 615.

The kind of relationship that the Plaintiffs allege existed between the Board and the management of BCBSM is described in Dimieri & Weiner, *The Public Interest and Governing Boards of Nonprofit Health Care Institutions*, 34 Vand. L.Rev. 1029 (1981). The authors speak of the

"unfortunate situation [that] arises when either the corporation has no members or the articles of incorporation provide that the board of directors is coterminous with the corporation's membership. The absence of an effective membership means that the 'watchdog' function of shareholders, minimal though it may be, is nonexistent and that no independent group is empowered to elect the board of directors. Self-perpetuation of the existing board and the appointment of friendly successors inevitably results from this type of an arrangement. A self-perpetuating board of directors in turn naturally exacerbates the possibility of role reversal between management and the board, since control of the board is more easily 'captured' when the directors need not account for their actions to a membership that elects them."

*Id.* at 1037 (footnotes omitted).

Those authors, however, recommend a statutorily authorized response by members: "[T]he right of members to bring derivative actions should be established in nonprofit corporation statutes, and the statutes should be amended to define the appropriate procedures required to maintain derivative suits on behalf of nonprofit corporations." *Id.* at 1065. Somewhat similarly, a commentator on North Carolina law would like to see standing for derivative suits clearly recognized in *members*, whether by legislation or judicial decision. *See* Note, *The Nonprofit Corporation in North Carolina: Recognizing a Right to Member Derivative Suits*, 63 N.C.L.Rev. 999, 1010 (1985).

One of the preeminent writers on nonprofit organizations, Howard L. Oleck, addresses the problem in *Nonprofit Corpo-*

*rations, Organizations & Associations* § 389 (4th ed. 1980), where he discusses members' derivative actions to enforce property rights. Oleck concludes:

"Admittedly, it is difficult to balance control and enforcement with initiative and philanthropy and still come up with a viable policing mechanism that will not stifle nonprofit growth. To this end, the only hope seems to be to either adopt a uniform nonprofit statute with enforcement sections that will work, or set up a separate policing agency not unlike what the SEC does for profit-oriented corporations."

*Id.* at 1150 (footnotes omitted).

█ We are not persuaded that standing to sue derivatively officers and directors of a nonprofit corporation should be extended to nonmembers, based on their status as contributors to the corporation or as users or buyers of its goods or services. Within the orbit of current case law the apogee is *Stern,* but the case before us is not as extreme factually as *Stern.* In addition to a self-perpetuating board, the court in *Stern II* considered relevant that the hospital was "not closely regulated by any public authority [and] it ha[d] no responsibility to file financial reports." 381 F.Supp. at 1019.

█ There was at the time of the alleged wrongs in this case, and there continues to be, considerable statutory and administrative regulation of BCBSM. *See* Art. 48A, § 354(a) (incorporating into Subtitle 20 Commissioner's general enforcement powers under §§ 24 and 25), § 354A–1(c) (incorporating Subtitle 15, "Unfair Trade Practices," into Subtitle 20), § 355 (Commissioner's initial approval of, *inter alia,* corporate structure, contracts with providers and with subscribers, of working capital and of reserves), § 356 (Commissioner's approval of changes to the foregoing and of rates), § 357 (annual statements of financial condition required), § 358 (examination of financial condition), and § 359 (limitation on investments). The Commissioner is authorized by § 360 to revoke the certificate of authority of any nonprofit health plan that "is being operated for profit or fraudulently conducted." Further, under § 358, the Commissioner has "the power of visitation"

over such nonprofit, health service corporations. We have strongly inferred that the visitatorial power at least embraces preventing conduct that is "violative of public law or of the charter and by-laws of the corporation." *Insurance Comm'r v. Blue Shield of Maryland, Inc.,* 295 Md. at 523, 456 A.2d at 928.

In addition, under the general corporation law, the Department of Assessments and Taxation "may authorize the Attorney General to institute proceedings against a corporation to determine whether the corporation has abused, misused, or failed to use its powers and franchises in a manner which, in the public interest, would make proper the forfeiture of its charter." CA § 3–513(a). This Court has affirmed the forfeiture of a charter under a predecessor statute when a fraternal beneficiary society had been conducting a general insurance business. *See The International Fraternal Alliance v. State,* 86 Md. 550, 39 A. 512 (1898). If a nonprofit corporation is the vehicle for the execution of a trust for charitable purposes, then standing is conferred by statute on the State, acting by the Attorney General, or on "any person having an interest in enforcement of the trust." Md.Code (1974, 1991 Repl.Vol.), § 14–301(a) of the Estates and Trusts Article.

Further, during the pendency of this action, the level of regulation of nonprofit health service plans was elevated by Chapter 507 of the Acts of 1993. The floor report of the House Economic Matters Committee summarizes that "[t]his bill increases the regulatory authority over nonprofit health service plans...." Floor Report on H.B. 238 at 1. The legislation expands the Commissioner's regulatory control, imposes stricter solvency requirements, and regulates the selection, conduct, and retention of officers and directors. *Id.* at 1–5. Among the latter features of the 1993 legislation is the requirement that at least two voting members of the board of directors of such a plan be members of the general public who have no financial interest in a plan, its affiliates or subsidiaries. *See* Md.Code (1957, 1994 Repl.Vol.), Art. 48A, § 360A(c). Subsection (d) of new § 360A impacts on self-perpetuating boards by requiring membership terms of three

years, staggered over a three year cycle, with a maximum period of service of nine years. There is no indication in the legislative history of the 1993 legislation that the General Assembly ever considered conferring standing on subscribers of a nonprofit health service plan to sue derivatively its officers and directors.

Thus, unlike the hospital in *Stern*, BCBSM is not an unregulated, nonprofit corporation. Further, a judicial expansion of the general law of standing to permit the Plaintiffs to sue derivatively meets an obstacle in the structure of Maryland corporation law. We have seen, *supra*, that the subtitle of the CA Article on nonstock corporations incorporates the general corporation law, subject to certain rules of construction. *See* CA § 5–201. We have further seen that the general definition of stockholder in CA § 1–101(t) includes a member of a nonstock corporation. Thus, when CA § 1–403(c) recognizes a derivative action based on *ultra vires* conduct, it recognizes such an action brought by a stockholder plaintiff in a stock corporation or by a member plaintiff in a nonstock corporation. To acknowledge standing on the part of the Plaintiffs, who are nonmembers of BCBSM, would require a very expansive construction of the corporation statutes, or would require declaring BCBSM to be a charitable trust by judicial fiat. Either approach exponentially enlarges the class of potential plaintiffs who could assert derivative claims against officers and directors of nonstock, nonprofit corporations.

The recommendation contained in the Revised Model Nonprofit Corporation Act (1987), approved by the Business Law Section of the American Bar Association, is directly contrary to expanding derivative suit standing. Section 6.30(a) of the Model Act reads:

"A proceeding may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by: (i) any member or members having five percent or more of the voting power or by fifty members, whichever is less; or, (ii) any director."

**46**

Official comment 1 to § 6.30 of the Model Act explains that "[t]he five percent or fifty-member test and the discretion a court has to award expenses (including counsel fees) if it finds that the suit was commenced without reasonable cause, should prevent strike suits and suits by a single or insignificant number of members."

A number of state legislatures directly have addressed derivative suits against officers and directors of nonprofit corporations (that are not executing a charitable trust). No state has legislatively conferred standing on persons who are not public officials or members of the corporation. On the other hand, at least sixteen states have statutes acknowledging that derivative suits may be brought by a member of a nonstock, nonprofit corporation. See Cal.Corp.Code § 5710(b) (West 1991); Ga.Code Ann. § 14–3–741 (Michie 1994); Idaho Code § 30–3–44(1) (1993); Ill.Ann.Stat. ch. 105, para. 107.80 (Smith–Hurd 1993); Mich.Comp.Laws Ann. § 450.2491 (West 1990); Minn.Stat.Ann. § 317A.165(2) (Supp.1994); Miss.Code Ann. § 79–11–193(1) (1989); Mont.Code Ann. § 35–2–1301(2) (1993); N.J.Stat.Ann. § 15A:3–5(a) (West 1984); N.Y. Not-for-Profit Corp. Law § 623(a) (McKinney 1970 & Supp.1994); N.C.Gen.Stat. § 55A–7–40(a) (1993); Or.Rev.Stat. § 65.174(1) (1993); 15 Pa.Cons.Stat.Ann. § 5717 (1994); Tenn.Code Ann. § 48–56–401(a) (1988); Wis.Stat.Ann. § 181.295(a) (West 1992); Wyo.Stat. § 17–19–630(a) (1993). Of these states that acknowledge derivative suits by members, nine states (Georgia, Idaho, Minnesota, Mississippi, Montana, New York, Oregon, Tennessee and Wyoming) require a minimum number or percentage of the members to have joined as plaintiffs before the action will be entertained.

We therefore decline Plaintiffs' invitation to adopt a principle for standing in derivative suits against nonstock, nonprofit corporations that would be broad enough to include Plaintiffs' assertion of the claims in this action.

## V

Plaintiffs have attempted to present an alternative argument under which they label themselves as "private attor-

neys general." The Plaintiffs also describe themselves as plaintiffs of last resort, by which they mean that no member of BCBSM has sued, BCBSM itself, acting through the SLIC, has not sued on as many claims as Plaintiffs undertake to assert, and the Attorney General has not filed any action. The particular thrust of Plaintiffs' private attorney general argument is that BCBSM occupies a unique position in insuring against the cost of health services in Maryland and that it is in the public interest for private citizen plaintiffs "of last resort" to assert the alleged rights of BCBSM against the defendants. To reinforce the public interest aspect of this argument, the Plaintiffs point to the quite liberal standing rules that this Court applies in taxpayer actions.

The instant action is not a taxpayer action. We have described one of the predecessors of BCBSM as "a private corporation offering a non-profit health service plan to the people of Maryland." *Baltimore County Hosp., Inc. v. Maryland Hosp. Serv., Inc.*, 234 Md. 427, 429, 200 A.2d 39, 41 (1964). We have said that that entity was "essentially engaged in the business of selling insurance." *Blue Cross of Maryland, Inc. v. Franklin Square Hosp.*, 277 Md. 93, 105, 352 A.2d 798, 806 (1976). The officers and directors of BCBSM are not public officials. The Plaintiffs do not "challenge a statute or the action of public officials acting under a statute." *Kerpelman v. Board of Public Works of Maryland*, 261 Md. 436, 443, 276 A.2d 56, 60, *cert. denied*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 100 (1971).

In other respects, the arguments presented by the Plaintiffs under their private attorney general heading are essentially policy considerations that we have reviewed and rejected for the reasons set forth in Part IV, *supra.*

For all of these reasons we hold that the Plaintiffs do not have standing to maintain the instant action.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.*