Dear Commissioner Larsen:
You have requested our opinion concerning your authority over part of the proposal to convert CareFirst, Inc. ("CareFirst") to for-profit status and merge it with WellPoint Health Networks, Inc. ("WellPoint"). In particular, you ask whether the conversion and sale of Group Hospitalization and Medical Services, Inc. ("GHMSI"), a subsidiary of CareFirst domiciled in the District of Columbia, is subject to the approval of the Maryland Insurance Commissioner ("the Commissioner"). You also ask whether, if the Department of Insurance and Securities Regulation in the District of Columbia approves the transaction relating to GHMSI, approval by the Maryland regulator is also required.
In our opinion, you have authority to review the part of the transaction relating to GHMSI under at least three statutes: (1) the Maryland Insurance Acquisitions Disclosure and Control Act, (2) provisions of Title 14 of the Insurance Article governing nonprofit health service plans, and (3) the State law governing the conversion of nonprofit health entities to for-profit status. Under those statutes, the Commissioner is to review the conversion and sale of an entity like GHMSI to assess its competitive impact, to ensure that the transaction is fair to policyholders, to preserve the insurer's financial stability, and to protect public or charitable assets. Each of those statutes allows for the Commissioner to defer to the judgment of the District of Columbia Insurance Commissioner, the primary regulator of GHMSI, in certain circumstances. However, it is within the Maryland Commissioner's discretion to decide whether and how much to defer to the judgment of the District of Columbia regulator. Approval by the District of Columbia regulator of the conversion and sale of GHMSI does not preclude review by the Maryland Commissioner under Maryland law.
 I Background
A. CareFirst and its Subsidiaries
CareFirst is a Maryland nonstock corporation that functions as a holding company for several nonprofit health insurers. One of CareFirst's subsidiaries is CareFirst of Maryland, Inc. ("CFMI"), which is also organized as a nonstock corporation under Maryland law and serves a large percentage of the Maryland health insurance market. Another subsidiary of CareFirst is GHMSI, a nonstock corporation organized under federal law and domiciled in the District of Columbia. GHMSI does business under the name Blue Cross/Blue Shield of the National Capital Area. It serves the health care needs of a substantial number of individuals in Montgomery and Prince George's counties, among other locations. CFMI and GHMSI each has a certificate of authority from the Commissioner to operate as a nonprofit health service plan in Maryland.[1]
The current corporate structure of CareFirst resulted in part from the combination of GHMSI with Blue Cross and Blue Shield of Maryland, the predecessor of CFMI, in the late 1990s[2] and the concomitant creation of a holding company. At that time, the Commissioner required that the holding company, as well as its Maryland subsidiary, be licensed as a nonprofit health service plan in Maryland. See In the Matter of theProposed Business Affiliation of Blue Cross and Blue Shield of Marylandand Group Hospitalization and Medical Services, Inc., Case No. MIA-240-12/97, Order (December 23, 1997) at p. 1. As a consequence, CareFirst, the holding company, has a certificate of authority to operate as a nonprofit health service plan in Maryland, even though it does not directly issue insurance policies.
B. Proposed Conversion and Merger with WellPoint
In November 2001, CareFirst entered into an agreement to merge with WellPoint, a for-profit corporation that is organized under Delaware law and owns Blue Cross of California, Blue Cross and Blue Shield of Georgia, and other health care insurers. The agreement envisions a two-step process: (1) the conversion of CareFirst and its subsidiaries to for-profit status and (2) the merger of a wholly-owned subsidiary of WellPoint with CareFirst and its subsidiaries. The conversion of CareFirst and its subsidiaries is a condition precedent to the merger.See Agreement and Plan of Merger, Recitals; Article VI, § 6.8; Article VII, § 7.1(a); Appendix A.
CareFirst has filed an Acquisition Statement (Form A) to obtain prior approval from the Maryland Insurance Commissioner for the conversion of CareFirst and CFMI to for-profit status and the acquisition of CareFirst and indirect control of CFMI and CareFirst's other subsidiaries, including GHMSI, by WellPoint. CareFirst has filed a similar application, with both the Commissioner and the Department of Insurance and Securities Regulation and the Office of Corporation Counsel in the District of Columbia, for prior approval of the conversion of GHMSI to for-profit status and of the indirect acquisition of GHMSI by WellPoint.
Your question relates to the Maryland Insurance Commissioner's authority over the conversion of GHMSI, a CareFirst subsidiary that holds a certificate of authority in Maryland, but is domiciled in another jurisdiction.
 II Analysis
At least three Maryland laws authorize the Maryland Insurance Commissioner to oversee the proposed transaction involving GHMSI. One law concerns changes in the corporate structure of insurers generally. Another law specifically pertains to changes in the structure of nonprofit health service plans. A third law specifically addresses the conversion of nonprofit health care entities, including health service plans, to for-profit status.
A. Insurance Regulation of Nonprofit Health Service Plans
Nonprofit health service plans are regulated generally under Title 14 of the State insurance law. See Annotated Code of Maryland, Insurance Article ("IN"), § 14-101 et seq. That title governs corporations "without capital stock organized for the purpose of establishing, maintaining, and operating a nonprofit health service plan through which health care providers provide health care services to subscribers to the plan under contracts that entitle each subscriber to certain health care services." IN § 14-102.
A nonprofit health service plan must have a certificate of authority from the Commissioner to operate in Maryland. IN §§ 14-108,14-140(a). Changes in the corporate structure of a nonprofit health service plan are subject to review by the Commissioner under Title 7 of the Insurance Article, the Maryland Insurance Acquisitions Disclosure and Control Act, which generally governs the acquisition of insurers. See IN § 14-102(6) (incorporating most of Title 7 of the Insurance Article). In addition, Title 14 of the State insurance law gives the Commissioner specific powers with respect to transactions involving subsidiaries of a nonprofit health service plan. See IN §§ 14-116,14-133.
1. Maryland Insurance Acquisitions Disclosure and Control Act
The Insurance Acquisitions Disclosure and Control Act is designed to protect the interests of policyholders and shareholders of insurance companies, to preserve competition in the insurance industry, to ensure that transactions between affiliates in an insurance company holding system are fair and reasonable, and to maintain the financial stability of insurers. IN § 7-102(a). The Act applies generally to any insurance company that has a certificate of authority to operate in Maryland. IN §§ 1-101(g), 7-103(a). Although most of its provisions apply to nonprofit health service plans,[3] the Act is not designed specifically to safeguard the public or charitable assets of those entities.
Subject to certain exceptions, Subtitle 3 of the Act governs the acquisition of an insurer organized under the laws of Maryland — referred to as a "domestic insurer" in the Act. IN §§ 1-101(m),7-301. That subtitle also applies to the acquisition of a holding company that controls a domestic insurer. Id. Subtitle 4 of the Act governs the acquisition of foreign insurers, again subject to a number of exceptions. IN §§ 7-401, 7-402.
Provisions of both subtitles apply to an entity that seeks to take control of a foreign nonprofit health service plan that, like GHMSI, is authorized to operate in Maryland. IN § 7-501(b). Specifically, they apply to transactions that involve a transfer of control of such a plan by "conversion" or "an agreement to merge or consolidate with or otherwise to acquire control of the plan." Id.
The Act mandates the filing of a pre-acquisition notification with the Commissioner by the entity making the acquisition.[4] IN §§ 7-303, 7-403. A notification may also be filed by the entity to be acquired. IN § 7-403(a)(2). The pre-acquisition notification is to contain certain information in a format prescribed by the National Association of Insurance Commissioners.[5] IN § 7-403(c). The Commissioner may require additional information about the competitive impact of the transaction, including an opinion of an economist. IN § 7-403(c)(2). After the notification is provided to the Commissioner, the Act mandates a "waiting period" of at least 30 days, subject to extension. IN § 7-404.
The Act directs the Commissioner to assess the competitive impact of the transaction.[6] For that purpose, the statute provides guidance on the definition of the relevant product and geographical markets. IN § 7-405(c). It defines "prima facie" evidence of an adverse effect on competition in terms of specified market shares of the combining companies. Id. If the Commissioner finds "substantial evidence" that the transaction will "substantially ... lessen competition"or create a monopoly, the Commissioner may order the parties to the transaction to cease and desist from doing business in the State or deny a certificate of authority. IN § 7-405(a)(2). However, the statute directs the Commissioner not to issue such an order if the public benefits that result from economies of scale or an increased availability of insurance outweigh any anti-competitive impact. IN § 7-405(b).
The Commissioner is to hold a hearing with appropriate notice and enter an order within a prescribed time period. IN § 7-405(d). If a proposed order disapproves the transaction because of its adverse competitive impact, an insurer is to have an opportunity to remedy any anti-competitive impact before the order becomes final. IN § 7-405(e).
With respect to a transaction involving a foreign nonprofit health service plan, the Act not only looks to the competitive impact of the transaction, but also provides additional criteria for disapproving the transaction. IN § 7-501(c) (incorporating IN § 7-306(b) by reference). Most of these criteria concern the fairness of the transaction to the plan's policyholders.[7] In particular, the Commissioner is to disapprove the transaction if the Commissioner finds, among other things, that: the financial condition of the acquirer would jeopardize the financial stability of the plan or prejudice the interests of policyholders (IN § 7-306(b)(3)); the acquirer has plans for liquidating, merging, or making other changes in business or management of the plan "that are unfair or prejudicial to policyholders" (IN § 7-306(b)(4)); the transaction would be contrary to the interests of the policyholders or the public based on the "competence, experience, and integrity" of the persons gaining control of the plan (IN § 7-306(b)(5)); or the interests of the policyholders "might otherwise be prejudiced, impaired, or not properly protected" (IN § 7-306(b)(7)).
However, the Commissioner's role may be abbreviated depending on the extent of regulation in the jurisdiction where the foreign plan is domiciled. The Act does not require review by the Commissioner of a transaction involving a foreign nonprofit health service plan if: (1) the laws of the jurisdiction under which the foreign plan is domiciled authorize the insurance regulator of that jurisdiction to investigate and approve the acquisition and (2) the Commissioner receives notice from the other jurisdiction of the transaction and has a right to request information and documents about the transaction. IN § 7-501(a)(2).[8]
Subtitle 7 of the Act also gives the Commissioner what amounts to a veto over certain transactions within an insurance holding company such as CareFirst. The Commissioner must be notified in advance of certain transactions between a domestic insurer and "another member of the same insurance holding company," which may only be consummated if the Commissioner does not disapprove them. IN § 7-703(b)-(d). Among other things, that requirement pertains to a material transaction that may adversely affect the insurer's policyholders. IN § 7-703(e)(5).[9] In reviewing a proposed transaction, the Commissioner is to consider whether the transaction adversely affects policyholders, is fair and reasonable to the parties, is consistent with financial stability of each insurer. See §§ 7-703(f), 7-702. In certain circumstances the Commissioner may rescind or set aside the transaction. IN § 7-703(g).
Finally, the Act provides some rules of construction in relation to other laws. In particular, any powers, remedies, procedures, and penalties provided by the Act are "in addition to" those provided by other laws. IN § 7-108. However, to the extent that the Act is inconsistent with other parts of State law, the Act prevails. IN § 7-109.
2. Additional Powers Under Title 14 of the Insurance Article
a. Changes Involving Subsidiary of Nonprofit Health Service Plan
Title 14 of the State insurance law requires that a nonprofit health service plan obtain the approval of the Commissioner as a prerequisite to altering the structure, organization, or ownership of an affiliate or subsidiary. IN § 14-133.[10] For purposes of this statute, "affiliate" is defined as an entity that "directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with" a nonprofit health service plan holding a certificate of authority from the Commissioner. IN § 14-133(a)(2). "Subsidiary" means an affiliate that, "directly or indirectly, through one or more intermediaries, is controlled" by another entity. IN § 14-133(a)(4) (incorporating by reference IN § 7-101(f)).
In particular, a nonprofit health service plan must "submit a statement of proposed action to the Commissioner before the plan may ... alter the structure, organization, purpose, or ownership of the plan or an affiliate or subsidiary of the corporation." IN § 14-133(c)(1)(ii).[11] The plan must file the statement at least 60 days before the effective date of the proposed action. IN § 14-133(c)(2). The proposed alteration of the corporate structure is subject to the approval of the Commissioner, who is to act within 60 days after receipt of the statement of proposed action. IN § 14-133(c)(3)-(4). If a plan fails to comply with these obligations, the plan must liquidate or divest itself of the affiliate or subsidiary in a manner approved by the Commissioner. IN § 14-133(e).
The statute does not set forth any specific criteria for the Commissioner to apply in determining whether to approve or disapprove a transaction. However, it may be inferred that fairness to policyholders and the financial stability of the plan are primary concerns in such a review. The approval requirement now codified in IN § 14-133 was part of 1993 legislation addressed to concerns over the operation of nonprofit health service plans. See Chapters 507, 617, Laws of Maryland 1993; see also Conference Committee Report on House Bill 238 (1993).
The 1993 legislation, in part a reaction to congressional hearings on the governance of Blue Cross and Blue Shield plans, was designed to expand the Commissioner's regulatory oversight of nonprofit health service plans. See Floor Report of House Economic Matters Committee for House Bill 238 (1993); see 4also O'Donnell v. Sardegna, 336 Md. 18,44-45, 646 A.2d 398 (1994). For example, other parts of the 1993 legislation gave the Commissioner specific oversight of the financial condition of nonprofit health service plans, imposed stricter solvency requirements, and set requirements for the selection, conduct, and retention of the officers and board of directors.
In addition, the 1993 legislation specifically made nonprofit health service plans subject to the Insurance Acquisitions Disclosure and Control Act. It also included provisions concerning the conversion of nonprofit plans to other forms of organization, including for-profit status. Those provisions primarily concerned fairness to policyholders and the financial stability of nonprofit plans. It is not unreasonable to conclude that the Legislature intended that the Commissioner consider the same factors, which are also articulated in other sections of Title 14, in approving or disapproving a transaction under IN § 14-133. SeeWeiner v. Maryland Insurance Administration, 337 Md. 181, 191, 652 A.2d 125
(1995).
As in the Insurance Acquisitions Control and Disclosure Act, there is an exception in IN § 14-133 for entities organized under the laws of other jurisdictions.[12] The Commissioner may authorize a plan to comply with the law of its jurisdiction of domicile if that jurisdiction regulates the ownership and operation of subsidiaries in the same manner as Maryland does. IN § 14-133(d).
b. Limits on Reorganizations, Affiliations, and Effective Conversions
Recent amendments to Title 14 provide the Commissioner with additional powers to address corporate restructurings involving foreign nonprofit health service plans. See Chapter 154, Laws of Maryland 2002. In particular, if a foreign plan, such as GHMSI, terminates an existing affiliation with a Maryland plan, such as CareFirst or CFMI, the Commissioner may revoke the certificate of authority of the foreign plan to operate in Maryland. IN § 14-116(e). Similarly, a Maryland plan may not reorganize itself under the laws of another jurisdiction, unless the Commissioner determines that the reorganization is in the public interest. IN § 14-116(d)(1). Nor may a plan effectively convert to a for-profit plan by altering its structure, operations, or affiliations to favor its for-profit activities. IN § 14-116(d)(2). Such a reorganization without the Commissioner's approval could result in revocation of the plan's certificate of authority. See IN § 14-112. These amendments of Title 14 were apparently intended to prevent a nonprofit health service plan such as CFMI from avoiding restrictions on conversion by shifting its business to another jurisdiction or to an affiliate in another jurisdiction, such as GHMSI. See Bill Analysis prepared for Senate Finance Committee concerning House Bill 1254 (2002).
B. Conversion Law
In addition to the Insurance Article, another State law governs the conversion and sale of nonprofit health entities, including nonprofit health service plans. Annotated Code of Maryland, State Government Article ("SG"), § 6.5-101 et al. Under that law, a nonprofit health service plan may not be sold or converted to a for-profit entity without the approval of the Insurance Commissioner. SG §§ 6.5-102, 6.5-305(b).[13] The conversion statute defines "nonprofit health service plan" to include entities with certificates of authority from the Insurance Commissioner. SG § 6.5-101(h). Thus, the statute applies to CareFirst, the holding company, as well as to its subsidiaries that hold certificates of authority in Maryland, such as CFMI and GHMSI.
The conversion law outlines the process for obtaining the Commissioner's approval. The plan must file a detailed application with the Commissioner. SG § 6.5-201. The application must not only identify the parties and the details of the transaction, but also include a financial and community impact analysis that addresses the statutory criteria for approval of the transaction. SG § 6.5-201(b).[14]
The Commissioner is to publish notice of the application and hold a public hearing. SG §§ 6.5-202, 6.5-203. The statute also permits the Commissioner to make the application available for public inspection and copying. SG § 6.5-201(c). In connection with the public hearing, the Commissioner may undertake discovery and retain experts on issues pertinent to his evaluation of the transaction. SG § 6.5-203(d), (e). The hearing, which is quasi-legislative in nature, is governed by regulations adopted by the Commissioner under the statute. See SG § 6.5-103(b); COMAR 31.02.06.
The conversion law also details the criteria governing the Commissioner's decision. In contrast to the determination under the Insurance Acquisitions Disclosure and Control Act, which is focused on a transaction's competitive impact and effect on policyholders, the conversion law requires the Commissioner to consider a broader public interest, including the impact on health care services and the preservation of public or charitable assets associated with the nonprofit plan.[15]
The Commissioner is to assess whether the transaction is "in the public interest"[16]) in particular, whether "appropriate steps have been taken" to preserve the value of public or charitable assets, to transfer the "fair value" of those assets to a public foundation,[17] and to ensure that charitable assets are not used to enrich the officers, directors, and trustees of the plan and that the remuneration of those individuals is not linked to the acquisition. SG § 6.5-301(b). Assets transferred to the public foundation must be in the form of cash. SG § 6.5-301(f).
The statute sets forth further specific criteria to guide the Commissioner in assessing whether the transaction is in the "public interest." In particular, the Commissioner is to consider:
(1) whether the transferor exercised due diligence in deciding to engage in an acquisition ... and negotiating the terms and conditions of the acquisition;
(2) the procedures the transferor used in making the decision, including whether appropriate expert assistance was used;
(3) whether any conflicts of interest were disclosed, including conflicts of interest of board members, executives, and experts retained by the transferor, transferee, or any other parties to the acquisition;
(4) whether the transferor will receive fair value for its public or charitable assets;
(5) whether public or charitable assets are placed at unreasonable risk if the acquisition is financed in part by the transferor;
(6) whether the acquisition has the likelihood of creating a significant adverse effect on the availability or accessibility of health care services in the affected community;
(7) whether the acquisition includes sufficient safeguards to ensure that the affected community will have continued access to affordable health care; and
(8) whether any management contract under the acquisition is for fair value.
SG § 6.5-301(e). The statute establishes additional criteria specific to transactions involving nonprofit health service plans, including whether the transaction:
(i) is equitable to enrollees, insureds, shareholders, and certificate holders, if any, of the transferor;
(ii) is in compliance with [the statute governing amendment or restatement of a corporate charter];
(iii) ensures that the transferee will possess surplus in an amount sufficient to:
1. comply with the surplus required under law; and
2. provide for the security of the transferee's certificate holders and policyholders.
SG § 6.5-303(2). The statute provides criteria for determining the "fair value" of the plan's assets.[18] SG §§ 6.5-301(d). In addition, the Commissioner must determine whether the payment of a break-up fee to the acquiring entity if the transaction does not proceed is in the public interest. SG § 6.5-301(g).
Because the statute applies to any nonprofit health service plan organized as nonstock corporation that holds a certificate of authority from the Commissioner, the conversion law applies to plans domiciled in other jurisdictions but licensed in Maryland. However, in the case of a foreign plan, the approval process may be truncated. The process set forth in the statute does not apply to the conversion of a foreign plan if the Insurance Commissioner determines, "based on the standards set forth in this title, that any public or charitable assets of the [nonprofit health service plan] that serve health care needs in this State will be adequately protected." SG § 6.5-307(a). Such a plan must submit an information copy of its application to the Insurance Commissioner. SG § 6.5-307(b).
If a conversion occurs without the approval of the Insurance Commissioner, the conversion statute provides the Commissioner with a number of remedies "in addition to any other remedies authorized by law." SG § 6.5-305(d). In particular, the Commissioner can require the parties to comply with the conversion law, order divestiture, revoke or suspend the certificate of authority of the nonprofit health service plan, and impose a monetary penalty of up to $125,000. Id.; IN § 4-113(d)(1). In addition, a violation of the conversion law is also grounds for revocation of a certificate of authority. IN §§ 4-113(b)(13), 14-112(2)(v).
C. Application to Proposed Transaction Involving GHMSI
The Commissioner must review the proposed conversion and acquisition of CareFirst and its subsidiaries, including GHMSI, under at least three of the statutes outlined above.
1. Review under Insurance Acquisitions Disclosure and Control Act
Because CareFirst is a domestic nonprofit health service plan, the entire transaction is subject to the Commissioner's approval under the Insurance Acquisitions Disclosure and Control Act. GHMSI itself is subject to the Insurance Acquisitions Disclosure and Control Act because GHMSI has its own certificate of authority to operate as a nonprofit health service plan in Maryland. Under the Act, the Commissioner's review of the proposed transaction must focus on a number of criteria primarily related to the competitive impact of the proposal and its effect on policyholders.
The jurisdiction in which GHMSI is domiciled — the District of Columbia — has a holding company law similar in substance to the Maryland Insurance Acquisitions Disclosure and Control Act. See District of Columbia Code § 31-703. If that law applies to this transaction — a determination within the purview of District of Columbia authorities — and if the Maryland Commissioner receives adequate notice of the conversion and acquisition of GHMSI and has the right to obtain information concerning the transaction, then the Maryland Act would ordinarily defer to the review conducted in the District of Columbia.
However, as proposed, the conversion and acquisition of GHMSI would not be an isolated transaction, but rather an element of the acquisition of its holding company. As described in the Acquisition Statements, the transfer of control of GHMSI to WellPoint will be achieved through the merger of GHMSI's parent, a domestic nonprofit health insurance plan. Because the proposed conversion and sale of GHMSI is an integral part of a transaction involving GHMSI's Maryland-domiciled parent and affiliate, which must be reviewed by the Commissioner, the Commissioner will inevitably examine the details of the GHMSI portion of the transaction when reviewing the conversion and sale of the Maryland entities. For example, the Commissioner's assessment of the competitive impact of the merger of CareFirst into WellPoint inevitably will also involve consideration of the current and future operations of GHMSI. Thus, while Subtitle 5 of the Insurance Acquisitions Disclosure and Control Act might arguably require the Commissioner to defer to the District of Columbia process if the transaction involved a conversion and sale of GHMSI alone,[19]
the Commissioner may properly consider that portion of the transaction in determining whether to approve the merger of CareFirst with WellPoint.
2. Review under IN § 14-133
The portions of the transaction involving CareFirst's affiliates and subsidiaries are also subject to review under IN § 14-133. Under IN § 14-133, the Commissioner has authority to review proposed changes in the corporate structure or ownership of subsidiaries and affiliates of a nonprofit health service plan like CareFirst. Because it is controlled by CareFirst, GHMSI is both a subsidiary and an affiliate of CareFirst. [20] GHMSI also is an affiliate of CFMI as the two entities are under common control. The proposed transaction would involve the merger of GHMSI's parent into a subsidiary of WellPoint. Under IN § 14-133, CareFirst is required to obtain the approval of the Commissioner to change the ownership or structure of a subsidiary such as GHMSI.
In making the determination required by IN § 14-133, the Commissioner should consider primarily the fairness of the transaction to policyholders and the financial stability of GHMSI and its affiliates. Under IN § 14-133(d), the Commissioner may, but is not required to, defer to the judgment of the District of Columbia regulator with respect to the part of the transaction involving GHMSI.
3. Review under the Conversion Law
Finally, the entire transaction, as well as the part relating specifically to GHMSI, is subject to review under the State conversion law. The merger of CareFirst with WellPoint is contingent on the conversion of the CareFirst entities, including GHMSI, from nonprofit to for-profit status. The State law governing the conversion of nonprofit health entities to for-profit status applies to the proposed conversion and sale of GHMSI, as well as to the related conversion and sale of its Maryland affiliates.
Under the conversion law, the Commissioner must determine whether the transaction is in the public interest, taking account of a number of specific factors. That statute directs the Commissioner to take account of additional factors affecting the public interest in the transaction, including its effect on the availability of health care in Maryland and the protection of public or charitable assets that serve health care needs in Maryland. Thus, the review mandated by the conversion law complements and does not conflict with that required under the Insurance Article. Cf. IN § 7-108 (procedures under Insurance Acquisitions Disclosure and Control Act "in addition to" those under other laws); SG § 6.5-201(a)(2) (application under conversion law "in addition to any other filing required by law").
If the Commissioner determines that public or charitable assets that serve health care needs in Maryland "will be adequately protected" by review of the GHMSI portion of the transaction in the District of Columbia, the Commissioner may dispense with a detailed review of that part of the transaction. SG § 6.5-307. On the other hand, if the Commissioner determines that the District of Columbia review will not focus on the preservation of Maryland assets or health care needs to the same degree as would the Commissioner's own review, then it would not be appropriate to defer. In any event, the decision whether to defer to the foreign regulator's determination is left to the discretion of the Commissioner. In deciding whether to review — and whether to approve — the transaction, the Commissioner must consider not only the price offered for charitable assets, but the effect of the transaction on the availability of and accessibility to health care in Maryland.
In our opinion, the conversion law contemplates a lesser degree of deference to a foreign regulator than does the Insurance Article. The Insurance Acquisitions Disclosure and Control Act and IN § 14-133
are concerned primarily with fairness to policyholders and the financial stability of the plan. Thus, the Commissioner is to defer to an insurance regulator in a foreign jurisdiction if that jurisdiction applies similar standards and the Commissioner is adequately informed. By contrast, even if the foreign jurisdiction has a comparable law for conversions of nonprofit insurers to for-profit status, the Maryland conversion law appears to grant greater discretion to the Commissioner to retain approval authority. Presumably, this is because the conversion statute is designed to protect public or charitable assets and health care resources that serve Maryland citizens — a concern unique to the Maryland Insurance Commissioner.
 III Conclusion
We conclude as follows:
1. Under the Maryland Insurance Acquisitions Disclosure and Control Act, the Commissioner must review the conversion of CareFirst and its sale to WellPoint in its entirety, including the portion of the transaction relating to GHMSI, according to several criteria, including competitive and financial impact. Although a transaction involving only GHMSI might be exempt from review in Maryland under this Act if a parallel law in the District of Columbia provides for similar review in that jurisdiction, the conversion of GHMSI is an integral part of the conversion and sale of GHMSI's Maryland-domiciled parent and affiliate, which is indisputably subject to the approval of the Maryland Commissioner. Accordingly, the Commissioner may appropriately review the elements of the transaction involving GHMSI as part of that process.
2. Because GHMSI is a subsidiary of an entity that is domiciled in Maryland and holds a certificate of authority to operate a nonprofit health service plan, the proposed alteration of CareFirst's corporate structure involving GHMSI is subject to the approval of the Commissioner under IN § 14-133. Approval would depend on the fairness of the transaction to policyholders and its financial impact on CareFirst and its affiliates, including GHMSI. However, the Commissioner may defer to the judgment of the District of Columbia regulator with respect to the portion of the transaction involving GHMSI.
3. Finally, the conversion and sale of GHMSI is subject to the approval of the Commissioner under the State conversion law, unless the Commissioner determines that "any public or charitable assets that serve health care needs in Maryland will be adequately protected" by a review conducted by the District of Columbia Insurance Commissioner. The Commissioner must consider not only the price offered for charitable assets, but also the effect of the transaction on the availability of health care in Maryland. The statute leaves it to the Maryland Commissioner's judgment whether to conduct a detailed inquiry with respect to GHMSI or to rely on the District of Columbia regulator's judgment.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] Regardless of where it is domiciled, a nonprofit health service plan must have a certificate of authority from the Insurance Commissioner in order to operate in Maryland. See Part II below.
[2] At that time, GHMSI was licensed by the National Blue Cross Blue Shield Association to use those names and trademarks in Prince George's and Montgomery counties; Blue Cross and Blue Shield of Maryland had the license for the rest of Maryland. In the Matter of the Proposed BusinessAffiliation of Blue Cross and Blue Shield of Maryland and GroupHospitalization and Medical Services, Inc., Case No. MIA-240-12/97, Order (December 23, 1997) at pp. 2-3.
[3] In 1993, the State insurance law was amended to apply the Act to nonprofit health service plans. Chapter 507, Laws of Maryland 1993,enacting Article 48A, § 354(8) and § 492(c), later recodified as
IN § 14-102(6) and § 7-103(b), respectively. The legislative history specifically mentions GHMSI and the predecessor of CFMI as entities that would be subject to the Act. See Conference Committee Report on House Bill 238 (1993).
[4] Failure to file a notification statement may result in an order requiring the parties to cease and desist from doing business in Maryland, a denial of a certificate of authority to the parties, and imposition of a fine. IN §§ 7-405(a), 7-406.
[5] If the transaction involves acquisition of a domestic insurer or holding company, Title 3 also requires the filing of an advance statement with the Commissioner providing, among other things, detailed information about the persons involved in the transaction, the source and amount of financing for the transaction, and future plans for the insurer. IN §§ 7-304, 7-305.
[6] Because such an acquisition is subject to regulation by the Commissioner, it is exempt from the State antitrust law. Annotated Code of Maryland, Commercial Law Article, § 11-203(4).
[7] The Commissioner may also disapprove the transaction if a post-transaction insurer would not satisfy the criteria for a certificate of authority (IN § 7-306(b)(1)), or if a party to the agreement is not itself an insurer (IN § 7-306(b)(6)).
[8] The Act also does not apply to the transaction if federal law preempts application of the Act. IN § 7-501(a)(1).
[9] The statute defines "material transaction" to include, for example, an asset change that exceeds 5% of the insurer's surplus. IN § 7-703(a)(1).
[10] This statute also restricts the ability of a nonprofit health service plan to enter into an affiliation with an unlicensed entity. See
§ 14-133(b). The Commissioner relied on that provision in requiring CareFirst, the holding company, to be licensed as a nonprofit health service plan in Maryland when the Commissioner approved the business combination between GHMSI and the Maryland plan in 1997. See Inthe Matter of the Proposed Business Affiliation of Blue Cross and BlueShield of Maryland and Group Hospitalization and Medical Services, Inc., Case No. MIA-240-12/97, Order (December 23, 1997) at pp. 34-35.
[11] The obligation to file a statement of proposed action and obtain the Commissioner's approval also applies when a plan intends to create, acquire, or invest in an affiliate or subsidiary in order to control that entity; to make an investment in excess of $500,000; or otherwise to invest in a subsidiary or affiliate. IN § 14-133(c)(1).
[12] The provisions in both statutes that authorize the Maryland Commissioner to defer to the judgment of the insurance regulator in a foreign jurisdiction were suggested by GHMSI, apparently with the District of Columbia statute in mind. See Letter of Richard A. Cook, Senior Vice President, GHMSI to Delegate Gary Alexander concerning House Bill 1472 (March 10, 1993); Letter of Gail M. Thompson, Administrator, Government Affairs, to Thomas P. Raimondi, Associate Deputy Commissioner, concerning House Bill 238 (January 29, 1993) at pp. 3-5. It is notable that, at that time, GHMSI was not affiliated with a Maryland-domiciled insurer, as it is today.
[13] SG § 6.5-102 provides that a person may not engage in the "acquisition" of a "nonprofit health entity" unless the transferor and transferee obtain approval from the "appropriate regulating entity." For purposes of the statute, a nonprofit health service plan is a "nonprofit health entity"; an "acquisition" includes the conversion of a nonprofit plan to a for-profit entity; the "appropriate regulating entity" is the Insurance Administration. SG § 6.5-101(b), (g)(2), (j)(2). SG § 6.5-305(b) reiterates specifically that an "acquisition" of a nonprofit health service plan may not occur without approval of the Insurance Administration.
[14] The application is "in addition to" any other filing required by law. SG § 6.5-201(a)(2). The reference to other filings evidently refers, in the context of a nonprofit health service plan, to filings such as the pre-acquisition notification required by the Insurance Acquisitions Disclosure and Control Act and the statement of proposed action under IN § 14-133. See Part II.A above. We understand that, in practice, the Insurance Administration accepts a single comprehensive filing for purposes of the various filing requirements.
[15] The current conversion law was enacted in 1998. Chapters 123, 124, Laws of Maryland 1998. It replaced an existing conversion statute for nonprofit health service plans in Title 14. See IN § 14-131
(1997 Repl. Vol.). The earlier statute made approval by the Commissioner a prerequisite for conversion of any plan organized under Maryland law to for-profit status. However, that statute did not explicitly require consideration of the disposition of public or charitable assets; rather, it focused primarily on the impact of conversion on policyholders and certificate holders, the financial condition of the plan, and whether plan assets would inure to the benefit of officers or directors of the plan.
[16] As originally enacted, the statute appeared to incorporate a presumption in favor of a proposed conversion, in that it directed the Commissioner to approve an acquisition "unless [the Commissioner] finds the acquisition is not in the public interest." During its most recent session, the General Assembly eliminated any such presumption by conditioning approval on an affirmative finding that the transaction is in the public interest. See Chapter 155, Laws of Maryland 2002, amending SG § 6.5-301(a).
[17] The General Assembly has created the Maryland Health Care Foundation for the purpose of receiving these assets. See Annotated Code of Maryland, Health-General Article, § 20-501 et seq.;see also SG § 6.5-301(b)(2).
[18] The Commissioner is to consider "all relevant factors," including the value of the plan if it had stock that was freely transferable, its value as a going concern, market value, investment or earnings value, net asset value, and a control premium, if any. SG § 6.5-301(d).
[19] Even a separate conversion and acquisition of a subsidiary may implicate Subtitle 7 of the Act and thus be subject to the Commissioner's approval. See Part II.A.1 of this opinion. Also, because the process required by the Act is "in addition to" procedures required under other statutes, the Commissioner may exercise approval authority over the transaction as outlined below.
[20] The statute defines "control" to mean:
 the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, through ownership of voting securities or of securities convertible into voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, whether or not the power is exercised or sought to be exercised. IN § 14-133(a)(3) (incorporating by reference IN § 7-101(c)). CareFirst is the sole member of GHMSI and therefore possesses the power to direct the management of GHMSI.
 *Page 3