Cape Hatteras Elec. Membership Corp. v. Stevenson, 2015 NCBC 34.

STATE OF NORTH CAROLINA

COUNTY OF DARE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 190

CAPE HATTERAS ELECTRIC )
MEMBERSHIP CORPORATION, an electric )
membership corporation organized and )
existing pursuant to N.C. Gen. Stat. Chapter )
117, )
        Plaintiff )
  )
  )
        v. )
  )
GINA L. STEVENSON and JOSEPH )
F. NOCE, )
        Defendants )

**OPINION AND ORDER ON
MOTIONS FOR SUMMARY
JUDGMENT**

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Plaintiff's Motion for Partial Summary Judgment as to First and Second Claims for Relief, Defendant Noce's Motion for Summary Judgment, and Defendant Gina L. Stevenson's Motion for Summary Judgment (collectively, "Motions for Summary Judgment"). On March 18, 2015, the Court held a hearing on the Motions for Summary Judgment.

THE COURT, after reviewing the motions, briefs in support of and in opposition to the motions, the record evidence filed by the parties, the arguments of counsel, and other appropriate matters of record, FINDS and CONCLUDES as stated herein.

*Vandeventer Black LLP, by Norman W. Shearin, Esq., Wyatt M. Booth, Esq., and Ashley P. Holmes, Esq. for Plaintiff Cape Hatteras Electric Membership Corporation.*

*Gray & Lloyd, LLP, by E. Crouse Gray, Jr., Esq. for Defendant Gina L. Stevenson.*

*Aldridge, Seawell, Spence & Hudspeth, LLP by Christopher L. Seawell, Esq. and W. Mark Spence, Esq. for Defendant Joseph F. Noce.*

McGuire, Judge.

PROCEDURAL HISTORY

1.      On June 7, 2013, Plaintiff Cape Hatteras Electric Membership Corporation ("Plaintiff" or "CHEMC") filed its Amended Complaint against Gina L. Stevenson ("Stevenson"), Joseph F. Noce ("Noce"), and other Defendants.  The other Defendants subsequently were dismissed and Stevenson and Noce are the only Defendants remaining in the action.  The Amended Complaint contains two claims against Stevenson for Declaratory Judgment (First and Second Claims for Relief), a claim for intentional interference with contractual relations against Noce (Third Claim for Relief), and a claim against Stevenson and Noce for civil conspiracy (Fourth Claim for Relief).

2.      On September 13, 2013, Noce filed a Motion to Dismiss.[1]

3.      On March 10, 2014, Plaintiff filed a Motion for Partial Summary Judgment as to its First and Second Claims for Relief.  In the First and Second Claims for Relief, Plaintiff seeks, as against Stevenson, "a declaration of the rights and obligations of the parties pursuant to" sections 1.08 and 2.10 of the CHEMC By-laws under G.S. § 1-254.  Plaintiff has not moved for summary judgment on its claims for intentional interference with contract or for civil conspiracy.

4.      On April 30, 2014, Noce filed a Motion for Summary Judgment seeking summary judgment in his favor on Plaintiff's intentional interference with contract and civil conspiracy claims alleged against him.

---

[1] Noce's Motion to Dismiss is coextensive with his Motion for Summary Judgment. Accordingly, the Court considers Noce's Motion to Dismiss as subsumed in his Motion for Summary Judgment.

5. On May 1, 2014, Stevenson filed a Motion for Summary Judgment seeking summary judgment in her favor on all claims asserted against her.

6. The Motions for Summary Judgment have been fully briefed and argued, and are ripe for determination.

FACTUAL BACKGROUND

The Court considers the following facts in deciding the Motions for Summary Judgment.[2]

5. CHEMC is an electric membership corporation duly chartered and incorporated under G.S. Chapter 117, with its principal office and place of business in Dare County, North Carolina. CHEMC is a public agency of the State of North Carolina. CHEMC's business is the transmission and redistribution of electric power, and the construction and maintenance of facilities related thereto.

6. CHEMC supplies electricity to its members residing within its service area. CHEMC is the exclusive provider of electric power to residents of Hatteras Island. CHEMC has the power of eminent domain as a private condemner pursuant to G.S. § 40-3(a), and it may acquire by purchase or condemnation property for, *inter alia*, the construction of power generating facilities, substations, and electrical transmission lines.

7. CHEMC is empowered to adopt By-laws. G.S. § 117-14(1). Members who join CHEMC "shall have complied with the terms and conditions in respect to membership contained in the By-laws . . . [p]rovided, that such terms and conditions of membership shall be reasonable." G.S. § 117-16.

---

[2] A court does not make findings of fact in ruling upon a motion for summary judgment. However, the court may summarize material facts that do not appear to be at issue and which justify the judgment. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975).

8.      CHEMC has adopted By-laws (hereinafter the "CHEMC By-laws" or the "By-laws"). Since at least 1989, the CHEMC By-laws have contained, inter alia, the following sections:

SECTION 1.08. **Member to Grant Easements to Cooperative and to Participate in Required Cooperative Load Management Programs.** Each member shall, upon being requested to do so by the Cooperative, execute and deliver to the Cooperative grants of easement or right-of-way over, on and under such lands owned or leased by or mortgaged to the member, and in accordance with such reasonable terms and conditions, as the Cooperative shall require for the furnishing of electric service to him or other members or for the construction, operation, maintenance or relocation of the Cooperative's electric facilities. Each member shall participate in any required program and comply with related rates and service rules and regulations that may be established by the Cooperative to enhance load management, to more efficiently utilize or conserve electric energy or to conduct load research.
…

SECTION 2.01. **Suspension; Reinstatement**. Upon his failure, after the expiration of the initial time limit prescribed either in a specific notice to him or in the Cooperative's generally publicized applicable rules and regulations, to pay any amounts due the Cooperative or to cease any other noncompliance with his membership obligations, a person's membership shall automatically be suspended; and he shall not during such suspension be entitled to receive electric service from the Cooperative or to cast a vote. Payment of all amounts due the Cooperative, including any additional charges required for reinstatement, and/or cessation of any other noncompliance with his membership obligations within the final time limit provided in the specific notice to him or the Cooperative's generally publicized applicable rules and regulations shall automatically reinstate the membership. After reinstatement, the member shall be entitled to receive electric service from the Cooperative and to vote.

9.      On July 21, 2009, Stevenson signed an "Application for Membership" in CHEMC by which she agreed to purchase electricity for her properties on Hatteras Island. In the Application for Membership, Stevenson agreed as follows:

to be bound by and to comply with all of the other provisions of the Cooperative's certificate of incorporation and By-laws, and all rules, regulations and rate schedules established thereto, as all the same now exist or may hereby be adopted or amended, and with the provisions of any supplemental contract that may, coincident herewith, be executed by me with the Cooperative.

10. Stevenson has been a member of CHEMC since July 21, 2009. As of December 2012, Stevenson was the owner of two separate lots on Hatteras Island in the Mirlo Beach subdivision designated Lot 9 and Lot 10.[3] Lot 9 consists of unimproved property, while Lot 10 has a residential house and other improvements on it.

11. For many years prior to the events involved in this lawsuit, Stevenson has lived with Noce, and they essentially have treated each other as husband and wife. Noce was involved in Stevenson's purchases of the properties on Hatteras Island, but Stevenson paid for them. Over the years, Noce has performed maintenance and upkeep work on the properties. Stevenson and Noce are also members of various limited liability corporations that exist for the purpose of renting Stevenson's properties. Noce has never been a member of CHEMC, and has not agreed to its By-laws.

12. During 2012, CHEMC determined that it would be necessary to relocate an existing 115kV electric transmission line that was used to transmit electricity to the residents of Hatteras Island. The relocation of the transmission line was made necessary by severe erosion caused by storms that resulted in encroachment on the transmission line right-of-way.

13. On December 21, 2012, Susan Flythe, Executive Vice President and General Manager of CHEMC, sent Stevenson a letter notifying her that she would be required, pursuant to the CHEMC By-laws, to grant CHEMC an easement or right-of-way across Lots 9 and 10 for purposes of relocating the transmission line.[4] The letter also advised Stevenson that CHEMC's attorney, Norm Shearin ("Shearin"), would be contacting her regarding the required easement.

---

[3] Stevenson apparently owns a third lot on Hatteras Island that is not involved in this lawsuit.
[4] CHEMC sought easements from a number of other property owners for the relocation of the transmission line, including the now dismissed Defendants originally in this lawsuit. Stevenson is apparently the only CHEMC member from whom it is still seeking the easement.

14.     On February 13, 2013, Shearin sent a letter to Stevenson enclosing a written copy of a "Right-Of-Way Agreement."  The letter stated that "you are obligated by the By-laws to grant the easement."[5]  The right-of-way easement ("easement") was 44 feet wide and provided CHEMC with "a permanent and perpetual right and easement of right-of-way" to construct, maintain, and repair any equipment or power lines CHEMC deemed necessary.[6]  The easement placed restrictions on Stevenson's rights to use the property that was within the easement, and provided CHEMC with the right to relocate the 44 foot easement on the properties at any time if CHEMC deemed it necessary.  The easement recited as consideration for its transfer "the sum of One Dollar ($1.00) and other valuable consideration."[7]  Neither the letter nor the easement stated that Stevenson had a right to negotiate the easement or to seek additional compensation in exchange for the easement.

15.     On February 20, 2013, Stevenson spoke to Shearin by telephone and advised Shearin that she did not intend to provide the easement.  Plaintiff does not allege that Shearin told Stevenson that CHEMC would negotiate the easement or consider paying her additional compensation for the easement.

16.     On March 26, 2013, Stevenson conveyed Lot 9 to Noce, and on April 2, 2013, Stevenson filed the conveyance with the register of deeds.  It is undisputed that Stevenson and Noce discussed which of them would take ownership of Lot 9 at the time Stevenson purchased it, and had discussed the transfer of Lot 9 to Noce prior to CHEMC requesting the easement. Stevenson and Noce testified that Stevenson conveyed Lot 9 to Noce as consideration for household bills, furniture, and vacations Noce had paid for on the couple's behalf over the years and that Stevenson believed she owed Noce.  Stevenson and Noce valued

---

[5] Stevenson Reply Br. Supp. Mot. Summ. J., Ex. 3.
[6] *Id.*
[7] *Id.*

the consideration for Lot 9 at $60,000, the original amount Stevenson had paid for the lot. Plaintiff has not presented any evidence to contradict Stevenson's and Noce's explanation regarding the conveyance.

17.     During April and May of 2013, Shearin sent correspondence to Stevenson's attorney seeking to obtain the easement.  Shearin also corresponded with Noce regarding CHEMC's intent to file eminent domain proceedings and its need to enter Lot 9. On April 15, 2013, CHEMC filed petitions for condemnation of property pursuant to G.S. § 40A-19 in Dare County Superior Court against Stevenson, Noce, and other property owners.

18.     On April 18, 2013, Shearin sent a letter Stevenson's attorney informing Stevenson that she had failed to comply with the obligation to grant the easement and "breached [her] obligation as cooperative-member by deliberately conveying one of your lots to [Noce] after receiving a written request to grant an easement."  The letter also warned Stevenson that CHEMC could suspend her membership pursuant to section 2.01 of the By-laws for failing to grant the easement.

19.     On May 15, 2013, Shearin sent Stevenson's attorney a letter notifying Stevenson that the CHEMC Board would vote on her suspension from membership on May 16, 2013, and that she should expect her electricity to be cut off by CHEMC by Memorial Day weekend.  The letter stated "[w]e encourage you and your client to communicate with us as soon as possible about the powerline easement sought from her."

20.     When Stevenson received the May 15 letter threatening to cut off her electricity, she realized she realized the issue was "on fire," and she immediately agreed to provide access to Lot 10 "out of duress."[8]  On May 17, 2013, the Dare County Clerk of Superior Court issued a Consent Order agreed to between CHEMC and Stevenson ("Consent Order").

---

[8] Stevenson Dep. 47.

In pertinent part, the Consent Order provided that: (1) CHEMC had the right to condemn the property; (2) any objections to the condemnation by Stevenson were resolved; (3) three commissioners were appointed to appraise the value of the easement; (4) CHEMC had the right to enter Lot 10 and begin use of the easement pending the determination of "just compensation;" and (5) the only remaining issue to be determined in the condemnation action is the amount of just compensation to be paid to Stevenson for the easement.

21.     There has been no determination reached regarding the compensation to be paid to Stevenson for the easement on Lot 10, and Stevenson has not conveyed an easement to CHEMC.

22.     On May 20, 2013, Shearin sent a letter to Stevenson along with an appraisal report for Lot 10.  The letter contained an offer from CHEMC to pay Stevenson $18,500 for an easement on Lot 10.  Shearin sent Noce an appraisal on Lot 9 and offer from CHEMC of $5,425 in exchange for an easement on Lot 9.  On May 28, 2013, CHEMC withdrew the offers of compensation to Stevenson and Noce and has not made any subsequent offers.

DISCUSSION

23.     Plaintiff's Motion for Summary Judgment seeks, as against Stevenson, "a declaration of the rights and obligations of the parties pursuant to" sections 1.08 and 2.10 of the CHEMC By-laws under G.S. §1-254. Stevenson also has moved for summary judgment on Plaintiff's claims for declaratory judgment regarding the interpretation of CHEMC's By-laws.  Accordingly, the Court will address Plaintiff's and Stevenson's motions regarding the declaratory judgments together. Noce moves for summary judgment on the intentional interference with contract and civil conspiracy claims alleged against him.  Stevenson also

has moved for summary judgment on the claim for civil conspiracy. The Court will address the civil conspiracy claims against Noce and Stevenson together.[9]

## A. Declaratory Judgment Claims

24. As noted above, in its first and second claims, CHEMC seeks a declaration regarding the "rights and obligation of the parties" pursuant to sections 1.08 and 2.01 of the CHEMC By-laws. Under North Carolina law, a declaratory judgment is a statutory remedy that grants a court the authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. G.S. § 1-253; *Pine Knoll Shores v. Carolina Water Serv., Inc.*, 128 N.C. App. 321, 321 (1998). Summary judgment may be granted on a claim for declaratory judgment if there remain no issues of material fact and either party is entitled to relief as a matter of law. *Smith v. Marez*, 217 N.C. App. 267, 270 (2011) (internal citation omitted). Here, there exists an actual controversy between CHEMC and Stevenson regarding their respective rights under the By-laws, and the facts necessary to a determination of those rights are not in dispute.

25. The parties dispute whether the By-laws constitute a contract between CHEMC and Stevenson. North Carolina, unlike some other jurisdictions, has not addressed the specific issue of whether an electrical membership corporation's By-laws create contract rights between the corporation and its members. *See e.g. Granbois v. Big Horn Elec. Coop.*, 986 P.2d 1097, 1011 (Mont. 1999); *First Fed. Sav. & Loan Ass'n v. E.End Mut. Elec. Co.*, 735 P.2d 1073, 1075-77 (Idaho Ct. App. 1987). North Carolina has recognized, however, that By-laws can, in some circumstances, constitute a binding contract if the parties agree to be bound by them. *Virmani v. Presbyterian Health Services Corp.*, 127 N.C. App. 71, 76-77 (1997) (Physician contractually bound by the defendant's By-laws when agreement granting him

---

[9] Plaintiff has conceded that it has no cognizable claim for interference with contract against Stevenson.

privileges at hospital was conditioned on his agreement to be bound); *Roberts v. Madison Cnty. Realtors Ass'n, Inc.*, 121 N.C. App. 233, 238 (1996) (Nonprofit corporation's By-laws were a contract between corporation and its members). The Court can see no reason that CHEMC's By-laws would not be a contract between CHEMC and Stevenson. Stevenson voluntarily agreed to be bound by the By-laws in exchange for becoming a member of CHEMC with its attendant benefits, including being provided with electrical power for her properties. Accordingly, the Court concludes that the By-laws at issue here constituted a contract between CHEMC and Stevenson.

26. Under North Carolina law, electric membership corporations, such as CHEMC, have the corporate purpose of supplying electric service to their members, provided that the members have complied with the terms and conditions in the By-laws of the corporation. G.S. § 117-16. The By-laws of an electric membership corporation may contain any term or condition "not inconsistent with law or its certificate of incorporation." G.S. § 117-14. Such terms and conditions provided in the corporation's By-laws, however, "shall be reasonable." G.S. § 117-16. "Whether a by-law is reasonable is a question of law for the Court." *Duffy v. Ins. Co.*, 142 N.C. 103, 107 (1906).

27. North Carolina also has granted electric membership corporations the authority to exercise the power of eminent domain consistent with the provisions of Chapter 40A of the General Statutes. G.S. §117-18(6). When the power of eminent domain is exercised, "a duty is imposed on [the] condemnor to pay just compensation for the property taken." *Virginia Elec. & Power Co. v. King*, 259 N.C. 219, 220 (1963). This duty is enumerated in the Fifth Amendment to the United States Constitution, and, although North Carolina has no express constitutional provision requiring payment, it is regarded as an integral part of the "law of the land" within the meaning of N.C. Const. art. I, § [19]. *Eller v. Bd. of Educ.*, 242 N.C. 584, 586 (1955).

28.     With these principles in mind, the Court turns to section 1.08 of CHEMC's By-laws. Section 1.08 provides that a member of CHEMC "shall, upon being requested to do so . . . execute and deliver to [CHEMC] grants of easement or right-of-way over, on and under such lands owned . . . , and in accordance with such reasonable terms and conditions, as [CHEMC] shall require." Stevenson contends that this provision is unreasonable because it arguably entitles Plaintiff to require a member to convey an easement or property interest on whatever terms Plaintiff specifies, including doing so without compensation in violation of the United States and North Carolina constitutions.[10] The Court disagrees.

29.     Significantly, CHEMC does not contend that section 1.08 provides it with an absolute right to require members to grant requested easements without compensation. Instead, CHEMC concedes that "the issue of compensation goes to reasonableness" of the terms and conditions under which it acquires the easement. Susan Flythe, Executive Vice President and General Manager of CHEMC, testified that CHEMC recognizes that compensation will be required in some cases.[11] According to CHEMC, whether compensation is offered under section 1.08 depends on the "amount of damage to [the member's] property" that would be caused by the proposed easement.[12]

30.     Section 1.08 does not state, by its express terms, that CHEMC can require members to provide any easement demanded by CHEMC without compensation, and the Court does not believe the language of the by-law supports such an interpretation.[13] Instead, the clause "in accordance with such reasonable terms and conditions" supports the conclusion that there could be circumstances in which payment for an interest in land is necessary, but

---

[10] *See* Stevenson Memo. Opp. Pl.'s Mot. Summ. J. 6-7.
[11] Flythe Dep. 78-80.
[12] *Id.* 78.
[13] In *Smith v. Pickwick Elec. Coop.*, 367 S.W.2d 775, 779 (Tenn. 1963), the primary authority relied upon by Plaintiff, the by-law at issue expressly provided that the defendant's members were required to provide requested easements "without charges to the cooperative."

also allows CHEMC to address situations where the impact of a proposed easement would be *de minimis* or would provide other benefits to the property owner and, therefore, not warrant compensation.[14] Moreover, because the provision requires terms and conditions of the transfer to be "reasonable," members are afforded some ability of to negotiate those terms with CHEMC. The provision simply does not require a member to grant an easement on any terms presented by CHEMC. Instead, section 1.08 provides a mechanism for CHEMC to engage its members as to the terms of the easement required, including the scope of the easement and whether compensation will be paid. Nothing in the express language of section 1.08 of the By-laws renders it unreasonable or invalid on its face.

31.     Stevenson argues, however, that because CHEMC has been granted the power of eminent domain, section 1.08 is unnecessary because, if compensation is to be paid for the easement, "the appropriate methodology . . . would be through eminent domain."[15] However, simply because CHEMC has the power of eminent domain does not render the by-law unnecessary or unreasonable. Instead, section 1.08 provides an alternate path to obtaining an easement from CHEMC members. Assuming CHEMC and a member can come to an agreement as to the reasonable terms of the easement, there is no reason for CHEMC to condemn the property through a potentially expensive and time-consuming eminent domain proceeding. Alternatively, if CHEMC and a member cannot come to an agreement and CHEMC still needs the easement, CHEMC can invoke its power of eminent domain and condemn the property. This procedure ultimately will allow CHEMC to obtain the easement, but also provides the member statutory protection and an established procedure for determining the ultimate reasonableness of the easement's terms, including compensation.

---

[14] *See* Flythe Dep. 78-80.
[15] Stevenson Memo. Opp. Pl.'s Mot. Summ. J. 7.

32.     CHEMC also seeks a declaration of the rights and obligations of the parties pursuant to section 2.01 of the By-laws. Section 2.01 provides that, in the event of, inter alia, a member's "failure to cease noncompliance with his membership obligations" following proper notice, CHEMC will automatically suspend the member's membership and the member will not be entitled to receive power from CHEMC during the suspension.

33.     On its face, section 2.01, like section 1.08, appears to be a reasonable by-law.[16] This provision allows CHEMC to enforce its By-laws, including the obligation of members to pay amounts due to CHEMC. Additionally, the notice requirement in section 2.01 provides protection against a member losing electric power without warning or an opportunity to cure the breach at issue.

34.     As applied in this case to enforce or compel compliance with section 1.08, however, the Court reaches a different conclusion regarding section 2.01. Using, or even threatening to use, section 2.01 to compel a member to provide CHEMC an easement severely restricts the ability of the member to negotiate as to the terms and scope of the easement. Taking these two provisions together, CHEMC has the ability to request an easement from a member and then effectively compel the member to grant the easement on CHEMC's terms under threat of expulsion and termination of the member's electric power. Once faced with the threat of losing electricity, the member undoubtedly will capitulate to whatever CHEMC demands regarding the easement. In fact, that is exactly what happened in this case; CHEMC was unhappy with Stevenson's response to its request for an easement, so it threatened to turn off her power on the eve of Memorial Day weekend.  Not surprisingly, Stevenson immediately agreed to a Consent Order granting CHEMC the rights it sought.  While

---

[16] Stevenson does not appear to argue that section 2.01 is unreasonable on its face. Stevenson only contends that, as applied to the facts at bar, the "dispositive issue regarding [s]ection 2.01 of [t]he Bylaws is not whether the policy is reasonable, but whether its implementation was reasonable under the facts and circumstances." Stevenson Memo. Opp. Pl.'s Mot. Summ. J. 8.

requiring a member to provide CHEMC an interest in property on terms that are subject to negotiation is not unreasonable, the ability of CHEMC to threaten to terminate that member's electricity in the event the parties do not agree on the terms of the easement is unreasonable.

35.     To be sure, CHEMC is not left powerless if a member refuses to provide an easement, or if negotiations over the terms of an easement break down. As noted above, CHEMC has the power of eminent domain. Accordingly, if CHEMC and a member cannot agree on an easement transfer pursuant to section 1.08, CHEMC can ultimately obtain the easement through that statutory process. This process guarantees CHEMC the ability to obtain any easement needed to continue to provide electric power to its members.

36.     Plaintiff relies on *King v. Farmers Electric Cooperative, Inc.*, 246 P.2d 1041 (N.M. 1952) in support of its argument that section 2.01 is reasonable when used to terminate a member's electricity because of their refusal to grant an easement requested by the cooperative.[17] Given the facts in this case, however, the finds *King* distinguishable and, therefore, not persuasive. In *King*, the by-law at issue both required the member to provide a requested easement and explicitly provided for expulsion and termination of electrical service if a member refused to provide the easement. *Id.* at 1044. In addition, the by-law in *King* did not require that the easement be provided on "reasonable terms and conditions". Finally, the court's opinion in *King* makes no mention of the defendant cooperative having eminent domain authority to obtain easements.

37.     Accordingly, the Court concludes that, as applied to enforce compliance with section 1.08, section 2.01 is an unreasonable, and therefore unenforceable, by-law. Nothing in this Opinion and Order, however, shall be construed to limit the ability of CHEMC to use

---

[17] Pl.'s Memo. Supp. Mot. Summ. J. 9-10.

section 2.01 to enforce any other by-law or the requirement that members pay for electric service.

### B.     Tortious Interference with Contract.

38.     Plaintiff alleges that Noce interfered with its contract with Stevenson by encouraging her not to grant the easements requested by Plaintiff and by participating in the conveyance of Lot 9 from Stevenson to Noce. Plaintiff alleges and argues that Noce knew of Stevenson's obligation under the CHEMC By-laws to grant the easement, knew that the easement was critical to CHEMC's ability to transmit electricity, and intentionally attempted to delay the process and increase Stevenson's bargaining power by his conduct. Plaintiff's only support for this claim, admittedly, is speculation regarding Noce's and Stevenson's motivations derived from the timing of the conveyance of the property.[18]

39.     Noce and Stevenson, on the other hand, testified without contradiction that a desire to breach the By-laws or interfere with Plaintiff's attempts to secure the easements did not play any part in Stevenson's decision to convey Lot 9 to Noce.[19] Stevenson and Noce had discussed the potential transfer of Lot 9 to Noce long before CHEMC sought the easement.[20] Stevenson transferred Lot 9 to Noce as repayment of a debt she believed she owed Noce for expenses he paid on their behalves.[21] Noce testified that he and Stevenson never discussed the CHEMC By-laws prior to the conveyance of Lot 9.[22] These facts are undisputed in this record.

40.     The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right

---

[18] Flythe Dep. 13-14.
[19] Noce Dep. 18-19, 20, 21-22, 24, 26; Stevenson Dep. 37-43.
[20] Stevenson Dep. 37-38; Noce Dep. 18-19.
[21] Stevenson Dep. 39-43; Noce Dep. 18-19, 21-22.
[22] Noce Dep. 24.

against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, (1988) (citing *Childress v. Abeles*, 240 N.C. 67, 84 S.E. 2d 176 (1954)).

41.     Even assuming that Plaintiff has shown the first, second and fifth elements, the undisputed facts establish that Noce did not intentionally induce Stevenson not to comply with the By-laws and that he acted with justification in accepting the conveyance of Lot 9 from Stevenson.  Accordingly, Noce's motion for summary judgment on the claim for tortious interference with contract should be GRANTED.

### C.     Civil Conspiracy.

42.     In its Fourth Claim for Relief, Plaintiff alleges that Stevenson and Noce conspired to "breach the contractual obligations of Stevenson under Section 1.08 of the By-laws."[23]  Plaintiff additionally alleges that "in furtherance of the said conspiracy, on or about March 26, 2013, Stevenson executed a deed to Noce" for Lot 9.[24]  In other words, Plaintiff alleges that Stevenson and Noce unlawfully conspired to convey Lot 9.

43.     In North Carolina, the elements of civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to the plaintiff; (4) pursuant to a common scheme. *Privett v. Univ. of N. Carolina*, 96 N.C. App. 124, 139 (1989). To establish a claim, the plaintiff must show an "overt act" committed by at least one conspirator in furtherance of the conspiracy. *Dove v. Harvey*, 168 N.C. App. 687, 690 (2006).

---

[23] Amend. Compl. ¶ 42.
[24] *Id.* ¶ 44.

44. Plaintiff's claim for civil conspiracy against Stevenson and Noce also fails. To begin, there is no allegation or any evidence in the record to suggest that Stevenson or Noce committed any unlawful act. Instead, Plaintiff's claim rests on the contention that the transfer of Lot 9, a lawful act which Stevenson had an absolute right to do, was done in an unlawful manner. *See Snyder v. Duke Power Co.*, 15 N.C. App. 211 (1972) (declining to impose tortious liability for undertaking an act Defendant had an absolute right to undertake). Even setting aside Stevenson's absolute right to dispose of her property as she sees fit, there is no evidence in the record to support the existence of a "common scheme" between Stevenson and Noce to breach Stevenson's obligations under section 1.08. Rather, Stevenson and Noce both testified, as described above, that a desire to avoid the obligations under section 1.08 played no role in the conveyance of Lot 9 and that the conveyance of Lot 9 had been the subject of numerous discussions prior to Plaintiff's attempt to obtain an easement. As noted above, this testimony is not contradicted in the record. Plaintiff has only presented testimony consisting of speculation as to the purpose of the transfer. Such speculation, in the face of otherwise uncontroverted testimony, does not create a genuine issue of material fact. *See Ramey Kemp & Assocs. v. Richmond Hills Residential Partners, LLC*, __ N.C. App. __, __, 737 S.E.2d 420, 425 (2013) (requiring party opposing summary judgment to present "admissible evidence, as compared to mere speculation or conclusory allegations, demonstrating the existence of a genuine issue of material fact" once movant provided evidence tending to show a lack of genuine issue of material fact). Accordingly, Stevenson's and Noce's Motions for Summary Judgment should be GRANTED as to Claim Four.

CONCLUSION

NOW THEREFORE, based upon the foregoing, it is hereby ORDERED that:

45.	As to Claims Three and Four, Defendant Gina L. Stevenson's Motion for Summary Judgment is GRANTED.

46.	Defendant Joseph F. Noce's Motion for Summary Judgment is GRANTED.

47.	As to Claims One and Two, the Court enters the following DECLARATORY JUDGMENT pursuant to G.S. § 1-254 regarding the rights, status, and other legal relations of the parties to this action pursuant to sections 1.08 and 2.01 of the CHEMC By-laws:

a.	Section 1.08 of the CHEMC By-laws creates a binding contractual obligation for members of CHEMC to grant to CHEMC easements or rights-of-way (hereinafter collectively referred to as "easements") over, on, and under such lands owned or leased by or mortgaged to the member for the furnishing of electric service to the member or other members or for the construction, operation, maintenance or relocation of CHEMC's electric facilities.  This right, however, is qualified by the requirement that the grant of the easement be on "reasonable terms and conditions," which may include, based on the circumstances, payment of compensation in exchange for the easement. Section 1.08 does not grant CHEMC an absolute right to require members to grant any easement required by CHEMC on terms unilaterally established by CHEMC, but rather requires CHEMC to negotiate in good faith with the member from whom it is seeking the easement of right-of-way. On its face, section 1.08 is a reasonable By-law.

b.	Section 2.01 of the CHEMC By-laws is reasonable on its face.  It is unreasonable, however, as applied to a member as means to enforce the member's obligation to grant an easement under Section 1.08 because it is impermissibly coercive and deprives the member of the opportunity to negotiate the terms of the easement, including compensation.  Accordingly, section 2.01 cannot be used by CHEMC as a means of requiring

a member to grant an easement on terms that have not been agreed to by the member. CHEMC retains the right and authority to obtain required easements by eminent domain.

This the 9th day of April, 2015.